AMERICAN AMUSEMENT MACHINE ASSOCIATION, et al., Plaintiffs,

v.

Teri KENDRICK, et al., Defendants.

No. IP00–1321–C–H/G.

United States District Court, S.D. Indiana, Indianapolis Division.

Oct. 11, 2000.

David L. Kelleher, Arent Fox Kintner Plotkin & Kahn, Washington, DC, Wayne C. Turner, McTurnan & Turner, Indianapolis, IN, for Plaintiffs.

Matthew R. Gutwein, Baker & Daniels, Indianapolis, IN, A. Scott Chinn, Corp Counsel for the City of Indianapolis, IN, for Defendants.

### ENTRY ON MOTION FOR PRELIMINARY INJUNCTION

HAMILTON, District Judge.

*Introduction and Summary*

The First Amendment does not prohibit states from restricting children's access to pornography even though adults' access to the same sexually explicit materials may not be restricted. See *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). This case presents questions about the extension of this rule of First Amendment law to video games with images of graphic violence. Indianapolis General Ordinance No. 72–2000 restricts the display and operation of coin-operated amusement machines (primarily video games) deemed "harmful to minors" if they include either "strong sexual content" or "graphic violence," as those terms are defined more specifically in the Ordinance. Under the Ordinance, children may not play or watch such games without a parent's permission.

Plaintiffs are in the business of manufacturing, distributing, or displaying video games. They have no quarrel with the Ordinance's restriction on children's access to games with "strong sexual content."

Plaintiffs contend, however, that the Ordinance's restrictions on games with "graphic violence" are content–based restrictions on speech that violate the First Amendment and that the Ordinance is unconstitutionally vague. Plaintiffs seek preliminary injunctive relief against its enforcement.

The first issue here is whether violent video games are forms of expression protected by the First Amendment at all. At this preliminary injunction stage of the case, the court concludes that at least some video games are expression entitled to First Amendment protection.

The second broad issue is whether a local government may restrict children's access to games with graphic violence, just as *Ginsberg* shows a government may restrict access to games with explicit sexual content. The court finds for several reasons that plaintiffs are unlikely to show that the Ordinance's restrictions on children's access to games with graphic violence violate the First Amendment. First, the City has shown that it has important and legitimate reasons to be concerned about violent video games causing harm to children. Second, the court is not persuaded there is any principled constitutional difference between sexually explicit material and graphic violence, at least when it comes to providing such material to children. Third, the Ordinance is carefully tailored to address the potential harm to children without infringing upon other First Amendment interests. The Ordinance does not bar or significantly limit adults from using the games in question, it does not engage in viewpoint discrimination, it does not limit the expression of ideas or other messages, and it authorizes only civil enforcement mechanisms.

In short, the Ordinance reflects a careful, reasonable, and limited extension of the principles applied in *Ginsberg* to protect children from pornography. The court also finds that plaintiffs are unlikely to prevail on their vagueness challenge to

the Ordinance. The court therefore denies plaintiffs' motion for preliminary injunction. This entry sets forth the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52 and 65.

### Factual Background

#### I. The Ordinance

On July 10, 2000, the City–County Council of the City of Indianapolis and Marion County adopted General Ordinance No. 72 regarding the operation and display of currency-operated amusement machines ("video games"). The Ordinance restricts children's access to video games containing graphic violence or strong sexual content by regulating the establishments that offer video games to the public.[1]

For constitutional purposes, the most important parts of the Ordinance are the definitions for games that are "harmful to minors." Those definitions trigger the substantive prohibitions of the Ordinance on the display of such games:

> *Harmful to minors* means an amusement machine that predominantly appeals to minors' morbid interest in violence or minors' prurient interest in sex, is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for persons under the age of eighteen (18) years, lacks serious literary, artistic, political or scientific value as a whole for persons under the age of eighteen (18) years, and:
> (1) Contains graphic violence; or
> (2) Contains strong sexual content.
> *Graphic violence* means an amusement machine's visual depiction or representation of realistic serious injury to a human or human-like being where such serious injury includes amputation, decapitation, dismemberment, bloodshed, mutilation, maiming or disfiguration.
> *Strong sexual content* means the visual depiction or representation by an

---

1. The full text of Ordinance 72, including the preamble, is set forth in the attached Exhibit

A.

amusement machine of nudity or explicit human sexual behavior by any human or human-like being in one or more of the following forms: masturbation; deviate sexual conduct; sexual intercourse; or, fondling of genitals.

*Nudity* means an amusement machine's visual depiction or representation of human male or female genitals, pubic area or buttocks with less than a fully opaque covering, or of a female breast with less than a fully opaque covering of any part of the nipple, or the showing of covered male genitals in a discernibly turgid state.

City–County General Ordinance No. 72–2000, amending Revised Code of the Consolidated City of Indianapolis and Marion County § 831–1. For purposes of the Ordinance, a minor is any unemancipated person under the age of 18. *Id.*

Section 831–5 of the City's Code, as amended by the Ordinance, sets forth the substantive prohibitions that apply to "registrants," who operate five or more video games in one location:

(h) It shall be unlawful for a registrant, a registrant's agent, or an employee of an amusement location knowingly to allow a minor who is not accompanied by the minor's parent, guardian or custodian to operate in the amusement location an amusement machine that is harmful to minors.

(i) It shall be unlawful for a registrant to operate an amusement location unless each amusement machine that is harmful to minors in the amusement location displays a conspicuous sign indicating that the machine may not be operated by a minor under eighteen (18) years of age unless the minor is accompanied by his or her parent, guardian, or custodian. If amusement machines that are harmful to minors are displayed together in an area separate from amusement machines that are not harmful, a single conspicuous sign in that area or at the entrance to that area may be used to mark the group of machines for purposes of this subsection.

(j) It shall be unlawful for a registrant to make available to patrons any amusement machine that is harmful to minors within ten (10) feet of an amusement machine that is not harmful. It shall further be unlawful for a registrant not to separate amusement machines that are harmful to minors from other machines by some form of partition, divider, drape, barrier, panel, screen, or wall that completely obstructs the view of persons outside the partitioned area of the playing surface or display screen of the machines that are harmful to minors. It shall be unlawful for a registrant, registrant's agent, or employee of an amusement location to allow a minor who is not accompanied by his or her parent, guardian, or custodian into the partitioned area.[2]

Violations of the Ordinance are punishable by civil fines under Section 103–3 of the Code. The minimum fine for a violation is $200. No more than one violation may be assessed on any one day. For multiple violations, a registrant or exhibitor may lose the right to make available to the public any machines that are "harmful to minors." The City may also suspend or revoke an amusement location's registration in some circumstances. See §§ 831–5(k)–(*l* ), 831–6(i), 831–9.

The record includes an unusually extensive legislative history for a local ordinance. Councillor Rozelle Boyd introduced an early version of the Ordinance to the City–County Council on April 10, 2000, which was referred to the Rules and Public Policy Committee. Ex. P–61. At two meetings the Committee debated the pro-

**2.** The three subsections of the Ordinance quoted in the text apply to "registrants," who are licensed operators of establishments with five or more games in one location. Parallel provisions apply to "exhibitors" of video games, who operate locations with four or fewer games. The principal distinction between "registrants" and "exhibitors" concerns the manner in which each type of establishment is required to organize and monitor the physical space where the games are displayed. See §§ 831–5(h)–(*l* ), 831–6(f)–(i).

posal and heard extensive public comment from industry representatives and community interest groups. Exs. P–51, P–52. In addition, several reports on the subject of children and violence in the media were made available to the Committee members. Ex. P–64. In response to comments on the original proposal, the Committee made several substantive changes and sent the amended proposal to the full City–County Council. Ex. P–52. The Council passed the Ordinance on July 10, 2000, and the Mayor of Indianapolis signed the legislation on July 17, 2000. Ex. P–53.[3]

The preamble to the Ordinance invokes the City's "compelling interests in protecting the well-being of minors, in protecting parents' authority to shield their minor children from influences that the parents find inappropriate or offensive, and in reducing juvenile crime." The preamble then sets forth the need for and purpose of the Ordinance by: (1) noting that "courts have recognized that minors are affected by and may be protected from patently offensive sex-related material;" (2) asserting that "recent academic literature corroborates the finding of earlier studies that violent video games produce psychological effects in minor children and that prolonged exposure to violent video games increases the likelihood of aggression in minor children," citing a particular study that also reviewed past research; (3) referring to "growing evidence of the harmful effects of violent video games" that had led Congress and the Federal Trade Commission to investigate such matters; (4) citing testimony before a congressional committee to the effect that fourth through eighth graders report spending an average of from half an hour to two and a half hours a week playing video games in arcades; and (5) asserting that parents are less able in public places than in the home to control the levels of violence and sexual content to which their children are exposed.

**3.** The Ordinance was to take effect on September 1, 2000. However, through an agreement reached between the parties after this action was filed, city officials agreed not to enforce the Ordinance until 24 hours after this court rules on plaintiffs' motion for a preliminary injunction.

## II. *Evidence about Video Games*

Coin-operated video games are an interactive form of entertainment. Each game is usually a stand–alone, self-contained machine consisting of both hardware and software. The player manipulates manual controls, such as guns, buttons, joy sticks, or steering wheels, in order to affect an imaginary computer–generated action sequence displayed on a screen. In the City's live demonstration at the hearing, the player participated in the action as a sniper firing an electronic rifle at "enemies" in a game called "Silent Scope 2." In a game called "Mortal Kombat 3," the player controlled a martial arts fighter engaged in combat against computer-controlled opponents.

The record identifies six commonly recognized categories of video games: "action-adventure" games, puzzle games, sports games, driving games, fighting games, and shooting games. The categories are convenient but not exhaustive or mutually exclusive. Nearly all games contain some sort of scoring mechanism by which a player can measure his or her progress in the game and compare his or her playing skills to the skills of others. In a fighting game, the player might score points based on the time it takes to defeat an opponent or the difficulty level of the fighting match. In an action-adventure game, a player might score points by accomplishing a certain set of tasks in the face of various obstacles.

At the hearing on plaintiffs' motion for a preliminary injunction, an art director from a video game development company described the typical game development process. As one might imagine, a new video game begins as a creative concept in the minds of the game developers. Teams of artists draw sketches of the characters and create "story boards" that depict the action sequences of the game. The story

line and themes of the game help guide the development of this "concept art." Computer programmers then take the concept art and create digital versions of the characters and the background scenes. The characters and scenes are then fully animated, and audio engineers add sound and music to the games.

The visual and audio presentation is meant to be interesting as well as informative in the sense that it provides cues that help guide the player through various stages of the game. Visual and audio effects are also used as "rewards" for skillful and successful play. In addition, when no one is playing the game, most video games operate in an "attract mode"—essentially advertising themselves to prospective players. In the "attract mode," the screen may show excerpts from the game, give instructions as to how the game is played, or introduce the characters and story line incorporated into the game.

The plaintiffs' game development witness further testified that video games are continuously increasing in complexity. Many of today's games include three-dimensional simulated environments and full motion video similar to the technology used in computer-animated feature films. From beginning to end, the running time to complete a game can be eight hours or more. Further specifics about video games and the research about their effects are set forth in discussion of specific issues.

III. *The Parties*

The seven plaintiffs in this action seek to protect their own interests as well as the interests of a class of businesses whose interests would be similarly affected by enforcement of the challenged provisions of the Ordinance. (At this point no motion for class certification has been filed.) Plaintiffs Namco Cybertainment, Inc. and B.J. Novelty, Inc. own and operate amusement machines in the City of Indianapolis. The Ordinance directly regulates these two plaintiffs. Plaintiffs Shaffer Distributing Company and Cleveland Coin Machine Exchange, Inc. distribute entertainment machines in the City of Indianapolis. They seek to ensure that sales of their products are not hindered by the Ordinance. Plaintiffs American Amusement Machine Association, Amusement & Music Operators Association, and the Indiana Amusement & Music Operators Association are trade organizations seeking to protect the interests of members whose businesses are likely to be affected by the Ordinance.

Defendants in this action are various officials of the City of Indianapolis and Marion County who have responsibility for enforcement of the Ordinance. Defendant Bart Peterson is the Mayor of Indianapolis. Defendant Teri Kendrick is the designated city prosecutor. Defendant Jack Cottey is the Sheriff for Marion County, and defendant Jerry Barker is the Chief of Police of the Indianapolis Police Department. All named defendants have been sued only in their official capacities, and all are referred to collectively here as "the City."

*Discussion*

I. *The Issues and Claims*

The City wrote the Ordinance with a close eye on First Amendment issues and the prospect of a challenge like this one. The City contends first that video games simply are not a form of expression protected under the First Amendment. Several courts reached that conclusion with respect to earlier, less sophisticated video games in the early 1980s. Assuming that such games are protected at all under the First Amendment, the City in its drafting tried to follow the reasoning of *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), which upheld similar restrictions on children's access to pornography as reasonable measures to protect children from harm. The City contends there is no principled constitutional distinction between pornography and graphic violence, at least with respect to children. In writing the Ordinance, the City also made a careful and deliberate effort to take the standard for unprotected obsceni-

ty as to adults and to adapt it to graphic violence for children. See *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

Plaintiffs respond that video games, at least the more elaborate games now in circulation, qualify as protected expression under the First Amendment. Plaintiffs therefore contend the Ordinance is an unconstitutional content-based restriction on protected speech. Plaintiffs also claim that the rule of *Ginsberg v. New York* is limited to material of a sexual nature and that the Ordinance could be constitutional only if the City could show it uses the least restrictive possible means to serve a compelling governmental interest, which plaintiffs contend would require definitive proof that violent video games in fact cause harm to children. As a separate but related claim for injunctive relief, plaintiffs also contend that the Ordinance is unconstitutionally vague—that it fails to provide the ordinary citizen with adequate notice of the prohibited conduct and fails to cabin the discretion of law enforcement personnel.

## II. *Preliminary Injunction Standard*

■ To obtain a preliminary injunction, plaintiffs must show (1) a reasonable likelihood of success on the merits, (2) irreparable harm if the preliminary injunction is denied, and (3) the inadequacy of any remedy at law. See *Grossbaum v. Indianapolis–Marion County Building Auth.*, 100 F.3d 1287, 1291 (7th Cir.1996). If this threshold showing is made, the court balances the harm to plaintiffs if the preliminary injunction is wrongly denied against the harm to the defendant if the injunction is wrongly granted. In the final step of the equitable analysis, the court must consider the public interest by weighing the effect that either granting or denying the injunction will have on non-parties. See *Grossbaum*, 100 F.3d at 1291; *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1067 (7th Cir.1994); *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir.1992); *Roland Machin-

ery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386–88 (7th Cir.1984).

■ Where plaintiffs assert a violation of their free speech rights, such claims ordinarily satisfy at least the minimum requirements for irreparable harm and inadequacy of legal remedies. As in most free speech cases, therefore, if plaintiffs could show they were likely to prevail on their constitutional claims, they would be entitled to a preliminary injunction.

## III. *Video Games as Protected Expression*

The threshold issue is whether video games are forms of expression entitled to any protection at all under the First Amendment. In the early 1980s, most courts examining the issue concluded that the video games of that era were not protected by the First Amendment. See, *e.g., America's Best Family Showplace Corp. v. City of New York*, 536 F.Supp. 170, 173–74 (E.D.N.Y.1982) (finding that video games were "pure entertainment" not protected by the First Amendment because there was no "element of information or some idea being communicated");*Malden Amusement Co. v. City of Malden*, 582 F.Supp. 297, 299 (D.Mass.1983) (adopting *America's Best* analysis); *Marshfield Family Skateland, Inc. v. Town of Marshfield*, 389 Mass. 436, 450 N.E.2d 605, 609–10 (1983) (rejecting First Amendment challenge to town's total prohibition on coin-activated amusement devices; court considered evidence of "Ms. Pac–Man," "Tron," "Donkey Kong," "Zaxxon," and "Kangaroo"), *appeal dismissed*, 464 U.S. 987, 104 S.Ct. 475, 78 L.Ed.2d 675 (1983); *Caswell v. Licensing Comm'n*, 387 Mass. 864, 444 N.E.2d 922, 926–27 (1983) (finding no First Amendment protection for video games where city denied license for automatic amusement devices; court considered evidence of "Space Invaders"); *City of Warren v. Walker*, 135 Mich.App. 267, 354 N.W.2d 312, 316–17 (1984) (holding that ordinance restricting children under

age 17 from playing video games did not violate First Amendment).

The reasoning of the Supreme Judicial Court of Massachusetts reflects these courts' approaches to the relatively new medium in the 1980s. In 1983, the Massachusetts court stated:

> From the record before us, it appears that any communication or expression of ideas that occurs during the playing of a video game is purely inconsequential. Caswell has succeeded in establishing only that video games are more technologically advanced games than pinball or chess. That technological advancement alone, however, does not impart First Amendment status to what is an otherwise unprotected game.

*Caswell,* 444 N.E.2d at 927 (rejecting analogies to movies and television as entertainment).

However, these courts in the 1980s did not foreclose the possibility that further development of video games might transform them into a medium of protected expression. Later in the same year, the Massachusetts court re-examined and followed *Caswell,* but also emphasized that *Caswell*'s result was fact-sensitive and not intended to foreclose all debate on the issue of video games as speech. The court cautioned: "We recognize that in the future video games which contain sufficient communicative and expressive elements may be created." *Marshfield Family Skateland,* 450 N.E.2d at 609–10; see also *Tommy & Tina Inc. v. Department of Consumer Affairs,* 117 Misc.2d 415, 459 N.Y.S.2d 220, 226–27 (N.Y.Sup.Ct.1983) (finding that video games considered in the case were not speech but leaving open the possibility that "games ... of a different nature" may be entitled to First Amendment protection), *aff'd,* 95 A.D.2d 724, 464 N.Y.S.2d 132 (N.Y.App.Div.1983), *aff'd mem.,* 62 N.Y.2d 671, 476 N.Y.S.2d 290, 464 N.E.2d 988 (1984).

It appears that few courts squarely addressed the issue during the 1990s, which was a period of substantial innovation in the video game industry. In 1991 the Seventh Circuit upheld a local ordinance that prohibited minors from playing video games during school hours. The court declined to decide whether video games are protected by the First Amendment and commented:

> On the basis of the complaint alone, we cannot tell whether the video games at issue here are simply modern day pinball machines or whether they are more sophisticated presentations involving storyline and plot that convey to the user a significant artistic message protected by the first amendment. Nor is it clear whether these games may be considered works of art. To hold on this record that *all* video games—no matter what their content—are *completely* devoid of artistic value would require us to make an assumption entirely unsupported by the record and *perhaps* totally at odds with reality.

*Rothner v. City of Chicago,* 929 F.2d 297, 303 (7th Cir.1991) (emphasis in original). In *Rothner* the court assumed for purposes of its decision that the games might have included protected expression. The court then found that the ordinance still amounted to a reasonable restriction on the time, place, and manner of expression. See *id.* Whether video games can be protected speech remains undecided in the Seventh Circuit and apparently in other circuits as well. See *Miller v. Civil City of South Bend,* 904 F.2d 1081, 1098–99 (7th Cir.1990) (*en banc*) (Posner, J., concurring) (suggesting that video games fall in a "gray area" and that government has a greater scope for regulation in this area which may be outside the boundaries of the First Amendment), *rev'd sub nom. Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991).

Plaintiffs in this case argue that the once-predicted future of video games has arrived, that the video games of the year 2000 have gone far beyond the simple displays in "Space Invaders" and "Pac–Man," and that many of today's games are highly interactive versions of movies and story-

books, replete with digital art, music, complex plots, and character development. The City argues that the limitations of the early medium have not been transcended and that, fundamentally, video games are still most closely analogous to mechanical pinball machines or shooting galleries at a local fair.

■ As a general matter, video games will be protected under the First Amendment only if they include sufficient communicative, expressive, or informative elements to fall at least within the outer limits of constitutionally protected speech. The Supreme Court has never articulated a precise test for determining how the First Amendment protects a given form of expression. Instead, the Court has stated generally: "Each medium of expression ... must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems." *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 557, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); see also David B. Goroff, *The First Amendment Side Effects of Curing Pac–Man Fever,* 84 Colum. L.Rev. 744 (1984) (analyzing the medium and arguing that video games are entitled to First Amendment protection). Any given form of entertainment, activity, or interaction may or may not be protected under the First Amendment. Rather than using these labels, the court finds it more productive to discuss the actual evidence presented by the parties.

■ Plaintiffs' evidence about the expressive components of video games centered on the "Gauntlet" series of action-adventure video games. The series includes Gauntlet Legends and Gauntlet Legacy, which were both released within the last three years. These games are currency-operated "amusement machines" as that term is defined in the Ordinance.

The Gauntlet Legacy story line deals with a fantasy world consisting of eight "realms" and an "underworld." The eight realms are ruled by a powerful wizard named Sumner, while the underworld is ruled by the principal villain of the story, Skorne. In the background story, Sumner's younger brother, Garm, accidentally opened a portal between the eight realms and the underworld. Skorne and his forces used the portal to invade the eight realms and disrupt Sumner's peaceful rule. Vanquishing the forces of the underworld from each of the eight realms appears to be the goal of the game, and, as best as can be deciphered from the record, a player participates in the action as one of eight "heroes" who can assist Sumner in attempting to defeat the underworld's "eight great abominations." The players travel to each realm in search of "items of legend" that will assist them in their task to recover the keys to the underworld and eventually to defeat the forces of Skorne once and for all.

Plaintiffs did not demonstrate a video game from the Gauntlet series, and the court does not have any information about whether the series includes graphic violence or strong sexual content for purposes of the Ordinance. There is also some ambiguity as to how much of the detailed story line is actually communicated to the players and as to how this communication takes place. However, the City did not attempt to rebut plaintiffs' description of the action-adventure games.

Without any attempt to assess artistic merit, the court finds that the visual art and the description of the action-adventure games in the record support plaintiffs' contention that at least some video games contain protected expression. It is difficult for First Amendment purposes to find a meaningful distinction between the Gauntlet game's ability to communicate a story line and that of a movie, television show, book, or—perhaps the best analogy—a comic book. Certainly the distinction cannot be simply that the game is interactive. The Internet is an interactive medium and receives First Amendment protection. See *Reno v. ACLU,* 521 U.S. 844, 868–69, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). Town hall meetings and some

theatrical performances are interactive, and their expression is also protected.[4]

As a further indication that at least some video games contain protected forms of expression, it would be theoretically possible for a law to engage in "viewpoint discrimination" in regulating video games. One can imagine a law requiring that, in games involving conflict and/or combat of some type, the player not be associated with forces of evil, darkness, or authoritarianism. In the opening sequence of "Silent Scope 2," for example, the player adopts the role of a sniper whose mission is to shoot enemy "terrorists" in a scene set in London. The fact that it is possible even to consider a "viewpoint" of "good guys" and "bad guys" in these games is a significant indication that there are at least some aspects of plot and character that may be entitled to at least some degree of First Amendment protection. The City properly concedes as much. Tr. 105–06.

The City's evidence on the issue of video games as speech focused on fighting and shooting games, including a video tape containing edited footage from six games: "Ultimate Mortal Kombat 3," "Mace: The Dark Age," "Maximum Force," "Time Crisis II," "Silent Scope," and "The House of the Dead 2." See Ex. 17. At the hearing, the City asserted that the video games shown in Exhibit 17 contained "graphic violence" as defined by the Ordinance. See Tr. 52.

In the first two games on the video tape, the player attempts to help his character survive and win one-on-one combat by executing various fighting tactics. The characters engage in hand-to-hand combat and use an assortment of weapons. "Ultimate Mortal Kombat 3" displays spurts of blood as blows are landed, and it appears that the fights end when one of the combatants is finally killed.

The remaining four games on the City's video tape are shooting games played from the first person perspective. In these "first person shooter" games, the view displayed on the screen is the view through the eyes of a gun-carrying character that the player controls. Of these four games "The House of the Dead 2" is the most graphic. The "plot" in "The House of the Dead 2" is that a town has been over-run by zombie-like characters who have killed many of the town's inhabitants. The player adopts the persona of "James," who is responding to the emergency. The zombies are "undead" human figures who are already substantially decayed and disfigured when James encounters them. The zombies attack James. James responds by shooting them. When shot, the undead die again in dramatic fashion. In some cases, the chest cavity explodes in a shower of blood, ribs, and gore, while in other cases the target is decapitated. The court observed at least one character whose entire upper torso appeared to have been severed from the lower half of the figure.[5]

In "Silent Scope 2," a game the City demonstrated live at the hearing, the player shoots a mounted gun at designated targets. The game is another "first person shooter" game. In other words, the screen simulates the scene as viewed from the perspective of an actual sniper using a rifle with a scope. The plot aspects are minimal, though not non-existent. The game amounts to electronic target practice on images of people.[6]

---

**4.** Some fantasy adventure books are also "interactive" in that the reader makes choices at critical points in the narrative and then flips to a page where the story continues based on the reader's decision. Not all readers make the same choices, and they reach different endings—similar to the different outcomes of the video games. Moreover, it is not difficult to imagine that a reader of a book based on Gauntlet's characters and its imaginary realms could have a discussion with an avid player of the Gauntlet video games about the plot and characters.

**5.** "The House of the Dead 2" displays a "Parental Advisory Warning" which informs the viewer: "This Game is Classified/Life–Like Violence/Strong." The rating is the product of a voluntary industry program. See Exs. P–68, P–69 (describing the rating system).

**6.** The evidence indicates that some of the more violent games include switches and settings that the exhibitor and/or the player may adjust. For example, "Silent Scope 2" was demonstrated on the "mild" violence setting, as it was found at an arcade. There is a

Based on the evidence in this record, the court finds that at least some contemporary video games include protected forms of expression. The court cannot deny a preliminary injunction based on the City's sweeping theory that video games simply do not fall within the scope of the First Amendment. The court has no difficulty determining that any speech elements of "Silent Scope 2," "The House of the Dead 2," and several of the other games described in the record are relatively inconsequential—perhaps even so inconsequential as to remove the game from the protection of the First Amendment. However, at least some games are protected by the First Amendment.

The nature of the Ordinance itself also cuts against the City's suggestion that video games can never be an expressive medium. Courts in *America's Best, Caswell,* and *Rothner* dealt with either licensing ordinances or other regulations that applied to all video games as a monolithic class. In this case, the City has singled out certain games for regulation based on their content: either "strong sexual content" or depictions of "graphic violence." It would be incongruous to conclude both that video games can be meaningfully distinguished based on their sexual and/or violent content, and that video games as a medium completely lack the capacity to communicate any *other* message, idea, or feeling that falls within the protection offered by the First Amendment. Considering the content-based nature of the Ordinance, the possibility of viewpoint discrimination in the medium, and the unchallenged description of action-adventure games, the protected content of some video games goes beyond their "strong sexual content" or their depictions of "graphic violence."

In finding that video games may contain at least some expressive content protected by the First Amendment, the court does not mean to suggest that video games are essential vehicles of political speech or fine art. Not all protected expression lies at the core of the First Amendment. For example, in *Barnes v. Glen Theatre, Inc.,* the Supreme Court found that several earlier cases supported the conclusion that the "nude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so." 501 U.S. 560, 565–66, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (plurality opinion); accord, *City of Erie v. Pap's A.M.,* 529 U.S. 277, ——, 120 S.Ct. 1382, 1391, 146 L.Ed.2d 265 (2000) (plurality opinion). Thus, even if, as the City suggests, video games can be labeled "low value" speech, they are entitled to protection under the expansive reach of the First Amendment. The court cannot deny a preliminary injunction based on the City's sweeping theory that video games are not protected expression.

### IV. Regulating Children's Exposure to "Graphic Violence"

The conclusion that at least some video games are protected by the First Amendment does not mean the City is powerless to regulate "graphic violence" in the games offered to children. The Constitution permits government to impose restrictions on speech in limited circumstances. Laws that arguably restrict speech are analyzed under a variety of First Amendment standards. Several can be rejected at the outset as inapplicable to the Indianapolis Ordinance.

First, the Ordinance does not regulate one of the categories of "unprotected" speech that the government has broad power to regulate as to adults. See *R.A.V. v. City of St. Paul,* 505 U.S. 377, 383–84, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (identifying obscenity, fighting words, and defamation as types of speech government can regulate because of "their distinctively proscribable content"); *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (no protection for words that incite imminent lawless action).

suggestion that other games have off/on "gore" switches.

Second, the City's asserted purpose in passing the Ordinance—protecting children from exposure to games with graphic violence and strong sexual content—makes it clear that the City is directly regulating the dissemination of this material and not merely the "secondary effects" that result from having video games physically located in certain neighborhoods. See *Reno v. ACLU*, 521 U.S. 844, 867–68, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (making this distinction in regard to regulation of offensive speech on the Internet); cf. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (upholding zoning ordinance that limited locations for adult movie theaters where purpose of the ordinance was to protect the city's retail trade, maintain property values, and protect the city's neighborhoods).

Third, the Ordinance is not a content-neutral attempt to regulate solely the time, place, or manner of minors' access to video games. See, *e.g.*, *Rothner v. City of Chicago*, 929 F.2d at 303. Instead, the Ordinance regulates video games based on their sexual and/or violent content.

The parties vigorously contest the standard that should apply here. Plaintiffs contend that the Ordinance amounts to a content-based restriction on speech that calls for the strictest possible scrutiny under the First Amendment. To meet this strict standard, plaintiffs claim that the City would need to show that the Ordinance uses the least restrictive possible means to serve a compelling governmental interest. Plaintiffs interpret "strict scrutiny" to mean that the City cannot prove it has a compelling interest in this case without definitive social science research establishing that playing violent currency-operated video games in fact causes children to engage in harmful aggressive behavior.

The City disagrees. In *Ginsberg v. New York* and in later cases, the Supreme Court has recognized that psychological protection of children is a compelling interest even without such definitive proof of actual harm. See 390 U.S. at 639–42, 88 S.Ct. 1274 (upholding restriction on distribution of pornography to children in the face of conflicting evidence about whether it had harmful effects on children). Based on *Ginsberg,* the City argues that it need not show definitive proof of harmful effects, so long as it has a reasonable basis for concluding there may be such harmful effects. Given that legitimate basis for regulation, the City contends, the Ordinance is carefully tailored to serve that interest without infringing other First Amendment interests. As explained below, the court agrees with the City.

A. *The First Amendment Rights of Children*

■ The City has built the constitutional foundation for the Ordinance on *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). In *Ginsberg* a store owner was prosecuted under a statute that prohibited the sale to minors of any magazine containing pictures that depicted "nudity, sexual conduct or sadomasochistic abuse and which is harmful to minors." 390 U.S. at 647, 88 S.Ct. 1274. The Supreme Court upheld the statute against a First Amendment challenge. The Court reasoned that the state had the power to define obscenity in a variable manner—one definition that applies to adults and a broader definition that applies to children. This approach has often been described as "variable obscenity."

The Court began its analysis by noting that (1) the so-called "girlie" magazines involved in the case were not obscene for adults, (2) the statute in question did not prohibit the sale of the magazines to adults, and (3) because the issue was not presented, it was assumed that the magazines were in fact "harmful to minors" within the definition of the statute. *Id.* at 634–35, 88 S.Ct. 1274. There was no doubt that the First Amendment would have protected adults' access to the magazines, but the Supreme Court upheld the restriction on access for children. Justice Brennan wrote for the Court:

We do not regard New York's regulation in defining obscenity on the basis of its appeal to minors under 17 as involving an invasion of such minors' constitutionally protected freedoms. Rather [the statute] simply adjusts the definition of obscenity "to social realities by permitting the appeal of this type of material to be assessed in terms of the sexual interests ..." of such minors. *Mishkin v. State of New York*, 383 U.S. 502, 509, 86 S.Ct. 958, 16 L.Ed.2d 56; *Bookcase, Inc. v. Broderick*, 18 N.Y.2d 71, 271 N.Y.S.2d 947 [218 N.E.2d 668, 671] (1966). That the State has power to make that adjustment seems clear, for we have recognized that even where there is an invasion of protected freedoms "the power of the state to control the conduct of children reaches beyond the scope of its authority over adults...." *Prince v. Massachusetts*, 321 U.S. 158, 170, 64 S.Ct. 438, 88 L.Ed. 645.

*Id.* at 638, 88 S.Ct. 1274.

As in the case of obscenity laws that apply to adults, see *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), the *Ginsberg* Court did not require definitive proof of harm:

[O]bscenity is not protected expression and may be suppressed without a showing of the circumstances which lie behind the phrase "clear and present danger" in its application to protected speech. *Roth v. United States*, 354 U.S. 476, 486–87, 77 S.Ct. 1304. To sustain state power to exclude material defined as obscenity by [the New York statute] requires only that we be able to say that it was not irrational for the legislature to find that exposure to material condemned by the statute is harmful to minors. In *Meyer v. State of Nebraska*, 262 U.S. 390, 400, 43 S.Ct. 625, we were able to say that children's knowledge of the German language "cannot reasonably be regarded as harmful." That cannot be said by us of minors' reading and seeing sex material. To be sure, there is no lack of "studies" which purport to demonstrate that obscenity is or

is not "a basic factor in impairing the ethical and moral development of ... youth and a clear and present danger to the people of the state." But the growing consensus of commentators is that "while these studies all agree that a causal link has not been demonstrated, they are equally agreed that a causal link has not been disproved either." We do not demand of legislatures "scientifically certain criteria of legislation." *Noble State Bank v. Haskell*, 219 U.S. 104, 110, 31 S.Ct. 186, 55 L.Ed. 112. We therefore cannot say that [the New York Statute], in defining the obscenity of material on the basis of its appeal to minors under 17, has no rational relation to the objective of safeguarding such minors from harm.

390 U.S. at 641–43, 88 S.Ct. 1274.

Plaintiffs' First Amendment challenge to the Ordinance in this case is based ultimately on the premise that children have a First Amendment right to play video games, including those depicting graphic violence, without their parents' permission. Surely the plaintiffs have no *independent* First Amendment right to sell their entertainment services to children without the parents' permission.

*Ginsberg* shows, however, that the Court examines regulation of material that is arguably "harmful to minors" under a standard less strict, at least as a practical matter, than the presumption of unconstitutionality applied to most content-based restrictions. See, *e.g., Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 115, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (presuming unconstitutionality and applying strict scrutiny to strike down "Son of Sam" statute designed to prevent convicted criminal from profiting by selling the story of his crime). Under this standard, the government may restrict minors' access to some speech that is protected for adults.

Other Supreme Court decisions show that children have rights under the First Amendment, but that those rights are not

as broad as those of adults. Both *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), and *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), for example, demonstrate that children have significant First Amendment rights.

In *Tinker*, the Supreme Court held that a school could not punish a student for expressing his political opposition to the Vietnam War by wearing a black armband in school. 393 U.S. at 506–09, 89 S.Ct. 733. "Students in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State." *Id.* at 511, 89 S.Ct. 733.

Similarly, in *Barnette* the Court held that a student could not be punished for refusing to pledge allegiance to the flag and to the United States. 319 U.S. at 640–42, 63 S.Ct. 1178 (1943). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Id.* at 642, 63 S.Ct. 1178.

Outside the school context, which raises its own set of issues, the Court's decision in *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975), also recognized that children have a First Amendment right of access to some materials—in that case, movies—even if the movies display nudity. The Court recognized, however, that those rights would not extend to materials deemed "obscene as to minors," as in *Ginsberg*. 422 U.S. at 212–13, 95 S.Ct. 2268. Similarly, in *Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989), the Court struck down a federal law banning all "dial-a-porn" telephone messages but recognized that a law blocking only children from receiving such messages would be constitutional. The majority recognized the limited First Amendment rights of children: "there is a compelling interest in protecting the physical and psychological well-being of minors. This interest extends to shielding minors from the influence of literature that is not obscene by adult standards." *Id.* at 126, 109 S.Ct. 2829; see also *id.* at 134, 109 S.Ct. 2829 (Brennan, J., dissenting in part) ("To be sure, the Government has a strong interest in protecting children against exposure to pornographic material that might be harmful to them.").

The limits of children's First Amendment rights are also evident in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), in which the Supreme Court established the standard for obscenity as to adults. The Court was sharply divided over that standard for adults, but an overwhelming majority of the Court recognized that distribution of sexually oriented materials to children raised a different set of questions. See 413 U.S. at 47, 93 S.Ct. 2607 (Brennan, J., dissenting) (noting that case did not present any issue about "state power to regulate the distribution of sexually oriented material to juveniles"); *id.* at 27, 93 S.Ct. 2607 (majority opinion) (pointing out dissent's implicit concession with respect to sexual material for children).

*Board of Education of Island Trees v. Pico*, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982), also demonstrates the limits on children's First Amendment rights. The Court considered the First Amendment implications of a school board's decision to remove several controversial books from the school library. All the books remained available to children in bookstores and through other channels. The Court did not agree on a majority opinion. However, the Justices who found that the school board might have violated the First Amendment acknowledged that the school board was free to remove books because they were deemed "vulgar" or because they were deemed psychologically or intellectually inappropriate for the age group. 457 U.S. at 871, 102 S.Ct. 2799 (plurality opinion of Brennan, J.); *id.* at 880, 102 S.Ct. 2799 (Blackmun, J., concurring). Similarly, all justices agreed that if

the school board removed books because of the ideas expressed in them, that would violate the First Amendment. See *id.* at 907, 102 S.Ct. 2799 (Rehnquist, J., dissenting); *id.* at 870–71, 102 S.Ct. 2799 (plurality opinion); *id.* at 877–78, 102 S.Ct. 2799 (Blackmun, J., concurring).[7]

The Supreme Court has not adopted a broad theory of children's First Amendment or other constitutional rights, nor has it demarked precise boundaries for those rights. See also *Goss v. Lopez*, 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (recognizing children's due process rights with respect to suspension or expulsion from public school, citing *Tinker* and *Barnette*); *In re Gault*, 387 U.S. 1, 13, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (adapting adults' procedural rights in criminal cases to juvenile delinquency proceedings; "neither the Fourteenth Amendment nor the Bill of Rights is for adults alone"). This court need not undertake such an ambitious project to decide the pending motion for preliminary injunction. It is sufficient for the present to observe that children's First Amendment rights are undeniably narrower than adults' rights, and that *Ginsberg* establishes a framework for regulating a narrow range of speech that is protected as to adults, but harmful as to minors.

Indianapolis wrote its Ordinance with *Ginsberg* in mind, and there are several important similarities indicating that *Ginsberg* provides the proper standard of review here.

First, as New York did in *Ginsberg*, the City relies on both its "independent interest in the well–being of its youth" and on

"the principle that 'the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society.'" See *Reno v. ACLU*, 521 U.S. at 865, 117 S.Ct. 2329, quoting *Ginsberg*, 390 U.S. at 639, 88 S.Ct. 1274. The Supreme Court has consistently recognized such interests as substantial, and it has done so without requiring social science research definitively proving the danger of harm to children.

Second, just as the New York law in *Ginsberg* did not materially limit adults' access to the pornographic materials in question, the City's Ordinance also does not significantly limit adult access to video games containing graphic violence. See *American Booksellers v. Webb*, 919 F.2d 1493, 1509 (11th Cir.1990) (upholding ordinance barring public display of materials deemed obscene as to children because it did not substantially limit adults' access to materials); *Crawford v. Lungren*, 96 F.3d 380, 387–88 (9th Cir.1996) (upholding law barring sale of pornographic material in unattended vending machines; law did not significantly restrict adults' access to such materials); *Upper Midwest Booksellers Ass'n v. City of Minneapolis*, 780 F.2d 1389, 1394–95 (8th Cir.1985) (upholding ordinance requiring that pornographic magazines be displayed for sale in sealed packages with opaque covers; ordinance did not substantially impair adults' access to regulated material); *M.S. News Co. v. Casado*, 721 F.2d 1281, 1288–89 (10th Cir. 1983) (upholding ordinance requiring that pornographic magazines be displayed for sale behind "blinder" covers on racks; ordinance also did not substantially impair adults' access to regulated materials).[8]

7. Both the reality of and the limits on children's First Amendment rights are also evident in *Prince v. Massachusetts*, 321 U.S. 158, 170, 64 S.Ct. 438, 88 L.Ed. 645 (1944), which held that a state could prohibit a child from distributing religious literature on public streets: "the power of the state to control the conduct of children reaches beyond the scope of its authority over adults, as is true in the case of other freedoms." *Prince* also explained *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), as having

guarded children's rights to receive teaching in languages other than English. See 321 U.S. at 166, 64 S.Ct. 438.

8. Plaintiffs have suggested in passing that the Ordinance might "burden" adults by creating a "peep show" stigma for adults who want to play video games with graphic violence or strong sexual content. There is no indication here, however, of any effect more burdensome than the fact that bars serving primarily alcohol by the drink do not admit children, or

Third, also like the New York law in *Ginsberg,* the Ordinance does not prevent parents who so desire from allowing their children to be exposed to the regulated material, either sexual material as in *Ginsberg* or sexual content or graphic violence in video games in this case. In other words, the Ordinance does not impose a total ban on access even as to children. In *Ginsberg* the Court noted that the New York law similarly allowed parents to permit their children to have access to the materials in question. 390 U.S. at 639 & n. 7, 88 S.Ct. 1274; cf. *Reno v. ACLU,* 521 U.S. at 878, 117 S.Ct. 2329 (lack of exception for parental consent imposed heavier burden on government to justify restrictions on indecent expression on the Internet).

Fourth, the Ordinance attempts to regulate only transactions in a commercial setting where it is reasonable to expect the seller to (1) physically segregate games that are harmful to minors, (2) effectively monitor the regulated games, and (3) verify the customer's age. Commercial exhibition of coin-operated video games is similar in this respect to selling magazines as in *Ginsberg,* and different from the Internet, telephone calls, and cable channels, which are discussed below with respect to government attempts to impose broad restrictions affecting adults because age verification presented a significant problem.

Fifth, the record demonstrates that many, perhaps most, video games contain only the barest minimum of protected speech, whereas magazines (at issue in

*Ginsberg* ) can lie much closer to the core of the First Amendment.

In light of these strong parallels, *Ginsberg* establishes the proper framework for deciding plaintiffs' First Amendment challenge to the Ordinance. The practical difference between the *Ginsberg* framework and the plaintiffs' interpretation of "strict scrutiny" lies in whether the City is required to prove that video games with graphic violence in fact cause harm to minors, or whether, as in *Ginsberg,* the City may rely on its compelling interest in the welfare of minors to legislate narrowly in a field where the available social science data reflect some arguable uncertainty as to the actual harm caused by video games. The applicable standard of scrutiny does not have a substantial effect on the outcome of the other First Amendment issues here.[9]

B. *Plaintiffs' Arguments for Strict Scrutiny*

■ Plaintiffs rely on several recent Supreme Court decisions to argue that the Ordinance should be subjected to "strict scrutiny," meaning the City would have the burden of showing the Ordinance is necessary to promote a compelling interest and that it has chosen the least restrictive means to further that interest. See, *e.g., United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 120 S.Ct. 1878, 1886, 146 L.Ed.2d 865 (2000) (applying strict scrutiny to the "signal bleed" provisions of the Telecommunications Act of 1996); *Reno v. ACLU,* 521 U.S. 844, 868, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997)

that adult bookstores are restricted to adults. In fact the evidence shows that about three-fourths of video games in Indianapolis are in bars where children already are not allowed. See Tr. 126; Pl. Dep. Ex. 9. The Ordinance does not even apply to such locations. See § 831–1.

9. Plaintiffs argue that the Ordinance regulates only willing providers and willing players who pay to play, so that there is no issue of a captive or unwilling audience. In *Ginsberg,* Justice Stewart's concurring opinion provided the answer to this point. He drew on the

Court's precedents dealing with captive audiences and wrote: "I think a State may permissibly determine that, at least in some precisely delineated areas, a child—like someone in a captive audience—is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees. It is only upon such a premise, I should suppose, that a State may deprive children of other rights—the right to marry, for example, or the right to vote—deprivations that would be constitutionally intolerable for adults." 390 U.S. at 649–50, 88 S.Ct. 1274.

(applying "most stringent review" to Communications Decency Act's restrictions on indecent and patently offensive Internet communications); *Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989) (applying strict scrutiny to prohibition of indecent telephone messages).

Plaintiffs contend that under strict scrutiny, the City must prove as a matter of fact that it has a compelling interest in restricting children's access to violent video games. In plaintiffs' view, that would require definitive proof from controlled social science research that playing coin-operated arcade video games in fact causes harmful aggressive behavior. Neither the cited cases nor others impose such a burden on the City in this case.

In *Sable Communications, Playboy Entertainment Group*, and *Reno v. ACLU* the Court took for granted the government's assertion that it had a compelling interest in protecting children from exposure to sexually explicit material that was constitutionally protected with respect to adults. See *Playboy Entertainment Group*, —— U.S. at —— – ——, 120 S.Ct. at 1886–87 (citing *Ginsberg* and recognizing government had compelling interest in protecting children from explicit sexual material, but means used to serve it reached too broadly and interfered with adults' rights); *Reno v. ACLU*, 521 U.S. at 875, 117 S.Ct. 2329 (same); *Sable Communications*, 492 U.S. at 126, 109 S.Ct. 2829 (same). All three decisions plainly indicated that measures restricting *only* children's access to the material would have been constitutional. *Playboy Entertainment Group*, —— U.S. at —— – ——, 120 S.Ct. at 1886–87; *Reno v. ACLU*, 521 U.S. at 878–79, 117 S.Ct. 2329 (noting that additional refinements of statute might also be needed, such as exception for "valued" messages and parental consent); *Sable Communications*, 492 U.S. at 126, 109 S.Ct. 2829. None of the three decisions indicated that a government would need definitive research results to prove harm before imposing content-based restrictions on children's access to material that could

reasonably be deemed harmful to them. The difficult problem in each of those three cases, which is not presented here, was that the technology of each medium made it difficult to restrict children's access without also restricting adults' access to the same material.

In *Sable Communications*, the Supreme Court reviewed federal legislation banning all so-called "dial-a-porn" telephone services offering prerecorded sexually oriented messages. The Court upheld the ban as applied to dial-a-porn messages that were obscene by adult standards, but it struck down the ban as applied to messages that were "indecent" but not obscene as to adults. See 492 U.S. at 126, 109 S.Ct. 2829. The asserted purpose of the federal statute was to prevent children from being exposed to indecent telephone messages, but the statute criminalized all indecent communications made by telephone. The government's theory was that the age of the caller could not be determined over the telephone, so the only effective way to limit children's access was to limit everyone's access. See *id.* at 122–23, 128–29, 109 S.Ct. 2829. Thus, the statute placed a total ban on adult access to indecent messages—a form of expression the First Amendment protects as to adults. In striking down the prohibition, the Court reaffirmed *Ginsberg* but wrote:

Sexual expression which is indecent but not obscene is protected by the First Amendment; and the federal parties do not submit that the sale of such materials to adults could be criminalized solely because they are indecent. The Government may, however, regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest. We have recognized that there is a compelling interest in protecting the physical and psychological well-being of minors. This interest extends to shielding minors from the influence of literature that is not obscene by adult stan-

dards. *Ginsberg v. New York,* 390 U.S. 629, 639–640, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); *New York v. Ferber,* 458 U.S. 747, 756–757, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). The Government may serve this legitimate interest, but to withstand constitutional scrutiny, "it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms. *Hynes v. the Mayor and Council of the Borough of Oradell,* 425 U.S. 610, 620, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 786, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)." *Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 637, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). It is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends.

*Id.* at 126, 109 S.Ct. 2829. Applying this standard to the ban on indecent communications, the Court held that the statute was "not a narrowly tailored effort to serve the compelling interest in preventing minors from being exposed to indecent telephone messages." *Id.* at 131, 109 S.Ct. 2829.

Thus, *Sable Communications* teaches that where government regulation of material harmful to children sweeps too broadly and unduly restricts the First Amendment rights of adults, strict scrutiny will likely be fatal to the challenged restrictions. As to adults, the regulation of indecent phone messages was simply a content-based restriction, and it failed strict scrutiny because it significantly affected *adults'* First Amendment interests. See *id.* (finding that the statute "has the invalid effect of limiting the content of adult telephone conversations to that which is suitable for children to hear."). In *Ginsberg,* by contrast, the Court explicitly found that the New York statute did not restrict adult access to the magazines.

*United States v. Playboy Entertainment Group, Inc.* and *Reno v. ACLU* are distinguishable from *Ginsberg* and this case on similar grounds. In both cases, the challenged statutes went beyond the government's asserted—and legitimate—interest in limiting minors' access to certain speech and significantly restricted adult access to protected communication. In *Playboy Entertainment Group,* the Court found: "To prohibit this much speech is a significant restriction on communication between speakers and willing adult listeners, communication which enjoys First Amendment protection." —— U.S. at ——, 120 S.Ct. at 1886 (assessing regulation of adult-oriented cable television stations whose video and audio signals, even when scrambled, could sometimes be heard or seen).

Similarly, when examining regulation of indecent speech on the Internet, the Court found that the statute "effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another. That burden on adult speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve." *Reno v. ACLU,* 521 U.S. at 874, 117 S.Ct. 2329. Thus, as in *Sable Communications,* the burden on adult speech was a significant factor in both the analysis and outcome of *Playboy Entertainment Group* and *Reno v. ACLU.* In both this case and *Ginsberg,* by contrast, there simply is no appreciable burden on adults' access to video games with strong sexual content or graphic violence. Cf. *Reno v. ACLU,* 521 U.S. at 864–66, 117 S.Ct. 2329 (identifying significant differences between the Communications Decency Act and the statute upheld in *Ginsberg* ).

Plaintiffs also rely on *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975), which presented a somewhat different problem. A local ordinance prohibited drive-in movie theaters from showing any film containing nudity when the screen was visible from a public street or public place. The Court found that the ordinance was so broad that

it violated the First Amendment rights of both adults and children:

In this case, assuming the ordinance is aimed at prohibiting youths from viewing the films, the restriction is broader than permissible. The ordinance is not directed against sexually explicit nudity, nor is it otherwise limited. Rather, it sweepingly forbids display of all films containing *any* uncovered buttocks or breasts, irrespective of context or pervasiveness. Thus it would bar a film containing a picture of a baby's buttocks, the nude body of a war victim, or scenes from a culture in which nudity is indigenous. The ordinance also might prohibit newsreel scenes of the opening of an art exhibit as well as shots of bathers on a beach. Clearly all nudity cannot be deemed obscene even as to minors. See *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). Nor can such a broad restriction be justified by any other governmental interest pertaining to minors. Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas that a legislative body thinks unsuitable for them. In most circumstances, the values protected by the first amendment are no less applicable when the government seeks to control the flow of information to minors.

422 U.S. at 213–14, 95 S.Ct. 2268; see also *Cinecom Theaters Midwest States, Inc. v. City of Fort Wayne*, 473 F.2d 1297, 1301–02 (7th Cir.1973) (finding a nearly identical drive-in movie ordinance unconstitutional on similar grounds). The problem with the ordinance in *Erznoznik* was that it swept too broadly. When government regulates speech based on content that is protected as to *both* minors and adults, an asserted interest in protecting the welfare of minors will not justify the law.

In summary, *Ginsberg* remains good law. Neither *Playboy Entertainment Group, Reno v. ACLU, Sable Communications*, nor *Erznoznik* required the Court to grapple directly with *Ginsberg*, and none of these cases undermined the holding of *Ginsberg* or the standard the Court applied to restrictions on material that was obscene as to minors. The City's regulation of children's access to video games on the basis of their strong sexual content, for example, appears to call for a relatively straightforward application of *Ginsberg*'s standards. This conclusion is consistent with the standard applied by the Supreme Court in *Playboy Entertainment Group, Reno v. ACLU*, and *Sable Communications*, where the Court expressly recognized the government's "compelling interest in protecting the physical and psychological well-being of minors," which extended to "shielding minors from the influence of literature that is not obscene by adult standards." 492 U.S. at 126, 109 S.Ct. 2829. The Court plainly indicated in *Sable Communications* that it would have upheld a law barring children's access to "dial-a-porn" services if the ban had applied only to children, see *id.* at 128–31, 109 S.Ct. 2829, and the same applies to the other two cases.

*Ginsberg* demands more from a statute than mere rationality: The government must have a compelling interest and the regulation must be carefully tailored to advance that interest. However, neither *Ginsberg* nor any other case requires the government, when it regulates speech to serve a compelling interest in the well-being of children, to provide definitive scientific proof that the restricted material in fact causes psychological harm to children.

## C. *Evidence on Potential Harm to Minors*

To fall within the reasoning of *Ginsberg*, the City must have had a reasonable basis for believing the Ordinance would protect children from harm and the Ordinance must be limited in scope to such material. In *Ginsberg* the Supreme Court acknowledged there was "no lack of 'studies' which purport to demonstrate that obscenity is or is not 'a basic factor in impairing the ethical and moral development of . . .

youth and a clear and present danger to the people of the state.'" 390 U.S. at 641–42, 88 S.Ct. 1274, quoting New York's legislative finding. The Court noted that a causal link between pornography and adverse effects on children had not been proved or disproved. The Court then concluded: "We do not demand of legislatures scientifically certain criteria of legislation." *Id.* at 642–43, 88 S.Ct. 1274, quoting *Noble State Bank v. Haskell,* 219 U.S. 104, 110, 31 S.Ct. 186, 55 L.Ed. 112 (1911).

Plaintiffs contend the City lacks an adequate basis for its claim that violent video games are "harmful to minors." Pl. Reply Br. at 1–6. The social science data in the record reflect some uncertainty, but the data also indicate that the City had a solidly reasonable basis for enacting the Ordinance. The Ordinance's legislative history also makes it clear that the Ordinance is the product of considered legislative judgment as to both the problem and the means chosen to address it.

The preamble to the Ordinance and the City's brief cite prominently a recent study examining the effects of violent video games on aggression-related variables, and reviewing evidence from other studies, as well. See Craig A. Anderson & Karen E. Dill, *Video Games and Aggressive Thoughts, Feelings, and Behavior in the Laboratory and in Life,* 78 J. Personality & Soc. Psychol. 772 (2000) (reproduced as Ex. P–55). Anderson and Dill conducted two studies. The first was a correlational study which used questionnaires to examine the relationship between long-term exposure to violent video games and several outcome variables, including aggressive behavior. The second was a laboratory experiment where participants were exposed to either a violent or non-violent video game and then participated in a separate game that provided the opportunity to exhibit aggressive behavior toward a competitor. Ex. P–55 at 9–11. The authors concluded:

> The present research demonstrated that in both a correlational investigation using self reports of real-world aggressive behaviors and an experimental investigation using a standard, objective laboratory measure of aggression, *violent video game play was positively related to increases in aggressive behavior.* In the laboratory, college students who played a violent video game behaved more aggressively toward an opponent than did students who had played a non-violent video game. Outside the laboratory, students who reported playing more violent video games over a period of years also engaged in more aggressive behavior in their own lives. Both types of studies—correlational—real delinquent behaviors and experimental—laboratory aggressive behaviors have their strengths and weaknesses. The convergence of findings across such disparate methods lends considerable strength to the main hypothesis that exposure to violent video games can increase aggressive behavior.
>
> Though the existence of a violent video game effect cannot be unequivocally established on the basis of one pair of studies, this particular pair adds considerable support to prior work, both empirical and theoretical. When combined with what is known about other types of media violence effects, most notably TV violence (e.g., Eron et al., 1987; Huesmann & Miller, 1994), *we believe that the present results confirm that parents, educators, and society in general should be concerned about the prevalence of violent video games in modern society, especially given recent advances in the realism of video game violence.*

*Id.* at 33–34 (emphasis added).

Anderson and Dill cautioned that: (1) empirical research on video game violence is sparse, (2) the methodologies of some older studies could be improved upon, (3) additional studies would be helpful, and (4) any causal statements would be premature. See, *e.g., id.* at 22 ("It could be that the obtained video games violence links to aggressive and nonaggressive delinquency are wholly due to the fact that highly

aggressive individuals are especially attracted to violent video games.").

Plaintiffs seize on these reasonable concessions to discount the relevance of Anderson's and Dill's work. The City, however, relies on the report only for what it is: one study that provides at least an indication that "concern about the potentially deleterious consequences of playing violent video games is not misplaced." *Id.* at 36.

Plaintiffs find at least two additional major faults with the Anderson and Dill studies. First, the studies did not specifically analyze the effects of coin-operated video games as opposed to home video games. Second, Anderson and Dill found correlations to aggressive behavior—not necessarily to *harmful* aggressive behavior. Plaintiffs therefore contend that the City could not reliably determine that coinoperated amusement machines video games are a "real" problem. After all, say plaintiffs, aggressive behavior on a football field is "encouraged." Tr. 81.

These arguments are not persuasive. Although home and arcade platforms for video games are different, that does not mean that studies of one are irrelevant to the other. Similarly, the more numerous studies on children's exposure to violence in other, older media—such as television violence—remain relevant to the question of the effects of video game violence. See generally Report of the Federal Trade Commission, App. A, *A Review of Research on the Impact of Violence in Entertainment Media* (Sept.2000) (reproduced as Ex. P–13) (discussing both television violence and violent video games in a review of research on "entertainment media violence"). Considering the similarities and differences between video games and television or movies, Anderson and Dill suggest that video games, due to their unique characteristics as an interactive media, may well pose a greater danger than either violent television or violent movies:

> In a sense, violent video games provide *a complete learning environment for ag-gression,* with simultaneous exposure to modeling, reinforcement, and rehearsal of behaviors. This combination of learning strategies has been shown to be more powerful than any of these methods used singly (Barton, 1981; Chambers & Ascione, 1987; Loftus & Loftus, 1983).

Ex. P–55 at 37 (emphasis added). In a video game, the player is not the passive viewer of violence on the screen. The player is instead the agent actually causing the increasingly realistic and violent action on the screen.

As for plaintiffs' proposed requirement of studies that definitively show a causal relationship between exposure to violent video games and actually harmful aggression, it is completely unremarkable that an academic study would use proxy variables to stand in for measures of actual, harmful aggression. The prospect of controlled experiments with human subjects that could result in aggression inflicting actual harm raises a few ethical issues, to put it mildly. Surely the constitutionality of a law does not depend on whether such experiments have been conducted.

The City was entitled to assess how such limitations in the data should affect the weight of the studies. In fact, members of the Rules and Public Policy Committee were provided with a copy of a paper that pointed out flaws and limitations of the experimental studies. See Jeffrey Goldstein, *Effects of Electronic Games on Children* (March 2000) (reproduced in Exhibit P–64).

Beyond the Anderson and Dill studies, the City has submitted additional evidence indicating that it was reasonable for the City–County Council to conclude that some violent video games are likely to be "harmful to minors." For example, Exhibit P–64 is a compilation of material distributed to several members of the Rules and Public Policy Committee while the Ordinance was under consideration. Included in the packet were statements by Dr. David Walsh and Dr. Jeanne B. Funk, both of

whom had provided testimony to the Senate Commerce Committee. Dr. Walsh, relying in part on the work of Anderson and Dill, called for additional research and concluded that "the concern about the impact of violent video games is justified." David Walsh, *Interactive Violence and Children*, Testimony before the United States Senate Commerce Committee (March 21, 2000) (reproduced in Exhibit P–64). Dr. Funk identified, from a theoretical perspective, several ways in which "playing violent video games could develop and prime aggressive thought networks." See Jeanne B. Funk, *The Impact of Interactive Violence on Children*, Testimony before the United States Senate Commerce Committee (March 21, 2000) (reproduced in Exhibit P–64).

Just after the City enacted the Ordinance, the American Academy of Pediatrics, the American Medical Association, the American Psychological Association, the American Academy of Child and Adolescent Psychiatry, and the American Academy of Family Physicians issued a Joint Statement on the public health aspects of violence in the media, including video games. The Joint Statement, which is Exhibit P–70, provides substantial support for the City's concerns about the effects of violent video games. In response to entertainment industry arguments that there is no proof that violent entertainment causes aggressive behavior and that children know the difference between fantasy and reality, the medical organizations said the industry was wrong on both counts:

At this time, well over 1000 studies— including reports from the Surgeon General's office, the National Institute of Mental Health, and numerous studies conducted by leading figures within our medical and public health organizations—our own members—point over-whelmingly to a causal connection between media violence and aggressive behavior in some children. The conclusion of the public health community, based on over 30 years of research, is that viewing entertainment violence can lead to increases in aggressive attitudes, values and behavior, particularly in children.

Ex. P–70. Specifically about video games, the medical organizations said: "Although less research has been done on the impact of violent interactive entertainment (video games and other interactive media) on young people, *preliminary studies indicate that the negative impact may be significantly more severe than that wrought by television, movies, or music.* More study is needed in this area, and we urge that resources and attention be directed to this field." *Id.* (emphasis added). A copy of the full Joint Statement is attached to this opinion as Exhibit B.

Thus, even if the debate over violence in video games and its harmful effects on children has not been resolved definitively, the City's evidence shows that the Ordinance is based on far more than mere legislative conjecture and surmise. Cf. *Eclipse Enterprises, Inc. v. Gulotta*, 134 F.3d 63, 66 (2d Cir.1997) (striking down law regulating sale of crime trading cards to children after finding that government's findings were based on "sheer surmise").[10]

Requiring the City to produce definitive proof of a causal connection between violent video games and psychological or physical harm to children would come very close to holding that graphic violence could never be regulated. Social phenomena such as violent behavior by children are explained by a multitude of factors. As the Supreme Court said in *Ginsberg*, "We do not demand of legislatures 'scientifically certain criteria of legislation.'" 390 U.S.

---

**10.** According to the evidence submitted by plaintiffs, "[a] majority of the investigations into the impact of media violence on children find that there is a high *correlation* between exposure to media violence and aggressive and at times violent behavior.... Regarding *causation*, however, the studies appear to be less conclusive." Report of the Federal Trade Commission, App. A, *A Review of Research on the Impact of Violence in Entertainment Media*, at 1 (Sept.2000) (reproduced as Ex. P–13) (emphasis in original).

at 642–43, 88 S.Ct. 1274. In fact, under plaintiffs' standard, the outcome of *Ginsberg* should have been different, for there certainly was nothing approaching definitive proof of harmful effects on children from exposure to sexually explicit materials. Yet plaintiffs contend they do not challenge *Ginsberg,* and surely there is no doubt that the result would be the same in *Ginsberg* today, even in the absence of definitive proof that exposure to pornography causes psychological harm to children.

### D. *The City's Adaptation of the Miller v. California Obscenity Standard*

The City's Ordinance was written carefully in light of both *Ginsberg* and the Supreme Court's current definition of adult obscenity as set forth in *Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). In *Miller,* the Supreme Court held that obscenity for adults is confined to "works which depict or describe sexual conduct," and that any attempt to regulate obscenity must be "limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value." *Id.* at 24, 93 S.Ct. 2607. To reduce the vagueness inherent in the open-ended term "patently offensive," however, the Court also required the proscribed conduct to be "specifically defined by the applicable state law." *Id.*; see also *Reno v. ACLU,* 521 U.S. at 873, 117 S.Ct. 2329 (discussing the inadequacy of the Communications Decency Act's definitions as compared to the *Miller* guidelines).

In an actual prosecution for violation of an obscenity statute that uses the *Miller v. California* guidelines, the trier of fact decides as questions of fact whether the material in question appeals to the "prurient interest" and whether the material is "patently offensive." See *Pope v. Illinois,* 481 U.S. 497, 500, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987). These questions of fact are determined by reference to contemporary community standards. See *Smith v. Unit-*

*ed States,* 431 U.S. 291, 293, 300–01, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977). A different standard applies to determine the social value of an allegedly obscene work: "The proper inquiry is not whether an ordinary member of any given community would find serious literary, artistic, political, or scientific value in allegedly obscene material, but whether a reasonable person would find such value in the material, taken as a whole." *Pope v. Illinois,* 481 U.S. at 500–01, 107 S.Ct. 1918. Under the reasonable person standard, a work need not obtain majority approval to merit First Amendment protection. *Id.* The inquiry into social value is considered "particularly important" because it "allows an appellate court to impose some limitations and regularity on the definition by setting, as a matter of law, a national floor for socially redeeming value." *Reno v. ACLU,* 521 U.S. at 873, 117 S.Ct. 2329.

The City's Ordinance modifies the *Miller* standard in two principal ways. First, the Ordinance rephrases the *Miller* standard in terms of minors rather than the community as a whole. Second, the Ordinance treats "graphic violence" in video games as a form of obscenity as to children. Plaintiffs contend that the City's two departures from *Miller* are constitutionally fatal to the Ordinance. Plaintiffs read the Supreme Court's obscenity jurisprudence, including *Miller* and *Ginsberg,* as strictly limited to material with sexually erotic content. The City contends that the state's interest in the well-being of children allows it to regulate children's access to graphic violence in video games as long as the regulation identifies a narrow range of violent material that is so morbid, offensive, and lacking in other value that it is harmful to children and unprotected by the First Amendment. This section and the next address these two important departures from *Miller* and *Ginsberg.*

The Ordinance adapts *Miller*'s "prurient interest," "patently offensive," and "societal value" prongs so that a video

game is "harmful to minors" and is regulated by the Ordinance if it:

predominantly appeals to minors' morbid interest in violence or minors' prurient interest in sex, is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for persons under the age of eighteen (18) years, lacks serious literary, artistic, political or scientific value as a whole for persons under the age of eighteen (18) years, and:

(1) Contains graphic violence; or

(2) Contains strong sexual content.

§ 831–1.

As required under the *Miller* guidelines, the Ordinance also contains specific definitions of both "strong sexual content" and "graphic violence" for these purposes. The definition of "strong sexual content," as well as the definition of "nudity," closely mirror the wording of the Indiana obscenity statutes. See Ind.Code §§ 35–49–1–5, 35–49–1–9, 35–49–2–2(1). To define "graphic violence," the City relied heavily on the standards used by the video game industry as part of a voluntary rating system. See Exs. P–68, P–69. The final version of the Ordinance defines graphic violence as "an amusement machine's visual depiction or representation of realistic serious injury to a human or human-like being where such serious injury includes amputation, decapitation, dismemberment, bloodshed, mutilation, maiming or disfiguration." § 831–1.

Adapting the *Miller* standard to children does not appear to be controversial in and of itself. Several states, including Indiana, have adapted the *Miller* standard to define sexual material that is "obscene as to minors." Moreover, courts have upheld such statutes as essentially updated and more refined versions of the variable obscenity standard the Supreme Court reviewed and upheld in *Ginsberg v. New York.* See, *e.g., American Booksellers v. Webb,* 919 F.2d 1493, 1503 & n. 18 (11th Cir.1990) ("Nothing in *Miller* casts any doubt on the constitutional viability of a variable standard of obscenity for minors

based upon a *Ginsberg*-like adaptation of the current Supreme Court standard for determining adult obscenity."); accord, *American Booksellers Ass'n v. Com. of Virginia,* 882 F.2d 125, 127 & n. 2 (4th Cir.1989) (upholding statute prohibiting display of sexually explicit material where children could examine it; statute used *Miller* standards modified for children); *M.S. News Co. v. Casado,* 721 F.2d 1281, 1286–87 (10th Cir.1983) ("We reject the argument that the use of the *Miller* test rendered the ordinance overbroad or vague."). Thus, a modified *Miller* standard has become a common way for states to regulate sexual material that is obscene as to minors but protected speech as to adults.

### E. Treating "Graphic Violence" as a Form of Obscenity as to Minors

Plaintiffs do not challenge the Ordinance's treatment of sexually explicit video games as "harmful to minors," but do contend that the First Amendment prohibits the City from taking these principles that apply to children's access to sexual pornography and extending them to video games that include "graphic violence." Plaintiffs assert (1) that the Supreme Court and the Seventh, Eighth, and Second Circuits have rejected any effort to extend the concept of obscenity as to minors beyond sexual material to include graphic violence; (2) that extension of the concept of obscenity as to minors to graphic violence is not warranted as a matter of constitutional law; and (3) that any such extension could not be limited and would devolve into broad censorship of protected expression on the theory that it is "harmful to minors."

The City concedes that no court has ever reached a holding that directly favors this step. However, the City also points out correctly that no court has rejected such a careful attempt to extend these principles to graphic violence. The City contends that the reasoning and policy of the "obscenity as to minors" cases extend to graphic violence and that courts can effectively limit the extension of those

cases to graphic violence without opening a door to broad censorship.

### 1. Drawing the "Obscenity" Line at Sexual Content in Prior Cases

The Supreme Court has often said that the standard for obscenity with respect to adults is limited to sexual materials. In *Reno v. ACLU*, for example, the Court noted that the *Miller* definition of obscenity "is limited to 'sexual conduct,'" which the court distinguished from the Communications Decency Act, which also included "excretory activities" and "organs" of both a sexual and excretory nature. 521 U.S. at 846, 117 S.Ct. 2329. In *Erznoznik*, the Court explained that the local ordinance ban on display of "nudity" in drive-in theaters in view of public streets was too broad because not all nudity was obscene even as to minors: "under any test of obscenity as to minors not all nudity would be proscribed. Rather, to be obscene 'such expression must be, in some significant way, erotic.'" 422 U.S. at 214 n. 10. In *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), the Court struck down a man's conviction for disturbing the peace based on his wearing of a jacket with the words "Fuck the Draft" in a courthouse. The Court held that the expression was not obscene within its First Amendment jurisprudence. The Court explained that a state could not prohibit expression as obscene unless it was "in some significant way, erotic." 403 U.S. at 20, 91 S.Ct. 1780.

Similarly, in *Cinecom Theaters Midwest States, Inc. v. City of Fort Wayne*, 473 F.2d 1297, 1301–02 (7th Cir.1973), which was essentially a precursor to *Erznoznik*, the Seventh Circuit said that a prohibition on nudity at drive-in theaters in view of public streets was too broad even as to children because not all nudity was ob-scene even as to minors. Although the ordinance in *Cinecom Theaters* did not include a restriction on violent movies, the Seventh Circuit quoted with approval the Fifth Circuit's language striking down a law restricting drive-in movies "depicting excessive brutality and criminal violence." The Fifth Circuit had written about that law: "While we recognize the interest of society in protecting children, we find even the child's freedom of speech too precious to be subjected to the whim of the censor." *Interstate Circuit, Inc. v. City of Dallas*, 366 F.2d 590, 598–99 (5th Cir.1966), vacated on other grounds, 391 U.S. 53, 88 S.Ct. 1649, 20 L.Ed.2d 415 (1968).

This court has considered these statements by the Supreme Court and Seventh Circuit carefully, and in context. This court is not persuaded that any of these statements foreclose the City's attempt to treat graphic violence, as defined and limited in the Ordinance, as a form of variable obscenity as to children. *Reno, Erznoznik*, and *Cohen* did not present any issue with respect to violence. It would be reading too much into that language in the opinions to conclude that the Court had considered and rejected the theory advanced by the City in this case. See *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386–87 n. 5, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ("It is of course contrary to all traditions of our jurisprudence to consider the law on this point conclusively resolved by broad language in cases where the issue was not presented or even envisioned."). This is especially true in First Amendment cases, where broad theories and conceptual labels are far more slippery than the facts of the cases and the results the Supreme Court actually reached. See *id.* at 383–84 (noting that many of the Court's broad statements about "unprotected" forms of speech cannot be taken literally).[11]

---

11. Plaintiffs point out that in the most recent Supreme Court decision dealing with violence as a form of obscenity, *Winters v. New York*, 333 U.S. 507, 508, 68 S.Ct. 665, 92 L.Ed. 840 (1948), the Court struck down the statute, which prohibited sale of written materials "principally made up of criminal news, police reports, or accounts of criminal deeds, or pictures, or stories of deeds of bloodshed, lust or crime...." Under plaintiffs' theory in this case, the Court should have struck down the statute by finding simply that violence cannot be "obscene." Instead, however, the Court struck down the statute on overbreadth and

As for the Seventh Circuit's approval in *Cinecom Theaters* of the Fifth Circuit's language in *Interstate Circuit,* this court has no doubt that the Dallas ordinance in question would fail any modern standard requiring reasonable specificity in defining the restricted content of the violence depicted. Vague references to "brutality, criminal violence or depravity," see 366 F.2d at 592, reach far too broadly into constitutionally protected expression even as to children. They also do not recognize the essential safe harbors under the *Miller* standard for material, for example, that does not depict violence in a "patently offensive way," or for works which, taken as a whole, have serious literary, artistic, political, or scientific value for children. For example, it might be difficult to study the history of the modern civil rights movement without information, and perhaps even some depictions, about "excessive brutality and criminal violence" aimed at non-violent protesters. This court does not believe, however, that the Seventh Circuit's comment in *Cinecom Theaters* was intended or should be understood as a blanket rejection of any future, more carefully drafted and better researched effort to protect children from exposure to forms of graphic violence.

Plaintiffs draw their strongest support from recent decisions by the Eighth and Second Circuits rejecting attempts to regulate children's access to some material with violent content. In both cases, the courts declared the laws facially unconstitutional.

In *Video Software Dealers Ass'n v. Webster,* 968 F.2d 684 (8th Cir.1992), a Missouri statute restricted the rental or sale of video cassettes depicting "violence." The statute included an adaptation of the *Miller* standards for obscenity. It limited the statute to materials, which, taken as a whole and applying contemporary community standards, had "a tendency to cater or appeal to morbid interests in violence" for persons under the age of 17, which depicted violence in a way which was patently

offensive to the average person applying contemporary adult community standards with respect to what is suitable for persons under the age of 17, and which, taken as a whole, lacked serious literary, artistic, political, or scientific value for persons under the age of 17. *Id.* at 687.

The fatal flaw was that the Missouri statute contained no definition of the key concept—"violence." The Eighth Circuit concluded that the absence of any reasonably precise statutory definitions, such as *Miller* requires with respect to sexual expression for purposes of adult obscenity, rendered the statute unconstitutional on its face. *Id.* at 689–91 ("Nothing less than rewriting the statute to include a definition of violence would begin to remedy the statute's vagueness.").

As plaintiffs point out, however, the Eighth Circuit also began its analysis by explicitly rejecting Missouri's contention that the violent videos targeted by the statute could be treated as "obscene" for children as an extension of *Ginsberg v. New York:*

> Obscenity, however, encompasses only expression that "depict[s] or describe[s] sexual conduct." *Miller v. California,* 413 U.S. at 24, 93 S.Ct. 2607; see *Roth,* 354 U.S. at 487, 77 S.Ct. 1304; *Erznoznik v. City of Jacksonville,* 422 U.S. at 213 n. 10, 95 S.Ct. 2268 (expression must be erotic to be obscene). Material that contains violence but not depictions or descriptions of sexual conduct cannot be obscene. [*Sovereign News Co. v. Falke,* 448 F.Supp. 306, 394 (N.D.Ohio 1977).] Thus, videos depicting only violence do not fall within the legal definition of obscenity for either minors or adults.

968 F.2d at 688. Because violent videos could not be equated with sexually obscene videos, the court found that *Ginsberg* did not supply the appropriate standard of review. The Eighth Circuit applied strict scrutiny to the statute as a content-based restriction on protected speech, and the

vagueness grounds, without hinting that violence could *never* be deemed "obscene."

statute flunked the test. *Id.* at 689, citing *Sable Communications,* 492 U.S. at 126, 109 S.Ct. 2829, as providing the applicable standard.[12]

The Second Circuit reached a similar result in *Eclipse Enterprises, Inc. v. Gulotta,* 134 F.3d 63 (2d Cir.1997), which struck down a local law making it a crime to distribute to minors, among other things, "any trading card which depicts a heinous crime, an element of a heinous crime, or a heinous criminal and which is harmful to minors." *Id.* at 64. The asserted purposes of the trading card law were to protect the psychological well-being of children and to combat juvenile crime. *Id.* at 67. The definition of "harmful to minors" was patterned after the *Miller* obscenity standard, and the local legislative body took the additional step of specifically defining "heinous crimes" as murder, assault, kidnaping, arson, burglary, robbery, rape, or other sexual offense. *Id.* at 64, 67.

The Second Circuit found that violence could not be equated with obscenity, treated the law as a content-based restriction on protected speech, and held it unconstitutional under strict scrutiny. *Id.* at 66–67. The court noted that only obscenity, defamation, fighting words, and direct incitement of lawless action have been recognized as unprotected speech, and then said: "We decline any invitation to expand these narrow categories of speech to include depictions of violence." *Id.* at 66. Turning to whether the law was narrowly tailored to serve the government's compelling interest, the Second Circuit declared that the local government had failed to show the law was either necessary or effective. The court simply found no evidence to support the contention that the crime trading cards were either harmful to

minors or contributed to juvenile crime. *Id.* at 68. The court added:

> Moreover, there has been no showing why trading cards should be singled out for regulation in preference to other material that is no less noxious. For example, books found in the County library and, at least according to one teacher, used in the classroom, contain descriptions of crimes and criminals no different from the information and depictions found in the crime trading cards.

*Id.*

*Video Software Dealers* and *Eclipse Enterprises* provide the strongest support for plaintiffs' challenge to the Indianapolis Ordinance. However, both decisions recognized that a narrower statute focused on violent expression might survive First Amendment scrutiny. The Eighth Circuit wrote: "In this case, we need not decide whether states can legitimately proscribe dissemination of material depicting violence to minors because Missouri's statute cannot survive strict scrutiny. * * * A more precise law limited to slasher films and specifically defining key terms would be less burdensome on protected expression." *Video Software Dealers,* 968 F.2d at 689. Similarly, the Second Circuit wrote that it was not deciding whether "carefully delimited and properly tailored restrictions on distribution of non-obscene but otherwise harmful speech to minors, especially younger minors, can ever pass the strict scrutiny test." *Eclipse Enterprises,* 134 F.3d at 67.

In a thoughtful concurring opinion in *Eclipse Enterprises,* Judge Griesa described some of the extraordinarily depraved crimes depicted in some of the trading cards. However, he also recognized that some of the cards regulated by the law, such as cards dealing with presi-

12. A third ground for the Eighth Circuit's decision was that the Missouri statute authorized penalties even if the merchant did not know the person renting a violent video was under 17. The court viewed a knowledge element as necessary both because the statute was "quasi-criminal in nature" and because

such an element is an appropriate requirement in any statute that chills the exercise of First Amendment Rights. 968 F.2d at 690. The City's Ordinance in this case requires proof of knowledge that the player is under age.

dential assassinations, criminal trials, and the careers of famous criminals depicting what might be found "in any widely circulated news articles or historical works" could not be prohibited as to adults or minors. 134 F.3d at 70–71. Judge Griesa found that the law had not been drafted with the kind of specificity referred to in *Miller* and *Reno v. ACLU.* Judge Griesa therefore recognized but did not try to answer the "surely debatable" question whether a law dealing with depictions of violence and crime could be drafted to meet constitutional standards. *Id.* at 71–72.

The Seventh Circuit has often instructed district courts in this circuit to give respectful consideration to the views of other circuits, but not to abdicate our responsibilities to give the parties before our courts the benefit of our independent judgment. See, *e.g., Colby v. J.C. Penney Co.,* 811 F.2d 1119, 1123 (7th Cir.1987), citing 1B Moore's Federal Practice ¶ 4.02[1], at 14–16 (2d ed.1984). This court has tried to do so with respect to the Second and Eighth Circuits' decisions. This court has no quarrel at all with the result in either *Video Software Dealers* or *Eclipse Enterprises.* Both laws were written so broadly that they failed any applicable First Amendment standard. However, with respect to the courts' broader statements that the *Ginsberg* variable obscenity standard for children cannot be extended to violence, this court is not persuaded. Neither opinion offers any reasoned or principled basis for distinguishing between sexual content and violence in evaluating whether children's access to graphic violence may be restricted as material "harmful to minors."

To support the view that "variable obscenity" cannot extend to violence, the Eighth Circuit cited the general comments of the Supreme Court quoted above, which did not directly address the issue of violence. See 968 F.2d at 688. The Eighth Circuit also cited *Sovereign News Co. v. Falke,* 448 F.Supp. 306, 394 (N.D.Ohio 1977), for the proposition that material that "contains violence but not depictions

or descriptions of sexual conduct cannot be obscene." The cited portion of *Falke* offered as support for that proposition only the same general comments by the Supreme Court, and it is no more persuasive in this respect. In addition, the court in *Falke* was dealing with a statute that was breathtakingly broad. See 448 F.Supp. at 398–400 (including as "harmful to minors" material that depicted "extreme or bizarre violence, cruelty, or brutality"). The broader statements in the opinion are not persuasive when applied to a more carefully drafted and better researched effort like the Ordinance in this case. In *Eclipse Enterprises,* the Second Circuit panel opinion also did not offer a reasoned explanation for declining to treat violence as a variety of variable obscenity as to children within the reasoning of *Ginsberg.* See 134 F.3d at 66–67.

Accordingly, this court does not believe the question of extension of "obscenity as to minors" to reach "graphic violence" is controlled by prior case law, at least in this circuit.

### 2. *Extending "Obscenity as to Minors" to Graphic Violence*

The First Amendment allows the state to restrict children's access to sexually explicit material, but does it forbid any comparable effort to restrict access to the most extreme and graphic violence? This court believes the answer is no. The court bases this answer on the reasoning of *Ginsberg,* which is based on the protection of children and which remains viable today, and on the lack of any persuasive, principled basis for distinguishing between graphic violence and explicit sexual content in terms of potential harm to children.

*Ginsberg* was based on the state's important and substantial interests in safeguarding the psychological well-being of children and enabling the exercise of parental responsibility. See 390 U.S. at 639–42, 88 S.Ct. 1274. Courts have repeatedly reaffirmed those interests as a legitimate foundation for laws regulating children's

access to some forms of speech. In addition to the cases discussed above, see *New York v. Ferber,* 458 U.S. 747, 756–57, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), and *ACLU v. Reno,* 217 F.3d 162, 173 (3d Cir.2000). The Eleventh Circuit has described the protection of children as "one of government's most profound obligations." *American Booksellers v. Webb,* 919 F.2d 1493, 1495 (11th Cir.1990) (upholding statute barring public display of sexually explicit materials deemed "harmful to minors"). Even the cases striking down overly broad attempts to regulate children's access to certain forms of speech took pains to recognize that government has a compelling interest in protecting children from material that is harmful to them. See *Sable Communications,* 492 U.S. at 126, 109 S.Ct. 2829; *Erznoznik,* 422 U.S. at 212, 95 S.Ct. 2268.

Justice Brennan's broad description of the state's interest for the Court in *Ginsberg* is not limited strictly to sexual material. A state's power to regulate indecent or harmful material for children, while still significantly limited by children's First Amendment rights, can extend beyond the regulation of sexual material upheld in that case. The focus of the case was harm to the ethical and moral development of children. See *Ginsberg v. New York,* 390 U.S. at 640–41, 88 S.Ct. 1274.

In fact, the case for regulating children's access to graphic violence is, if anything, stronger than the case for regulating children's access to explicit sexual material. In *Ginsberg* the Supreme Court was presented with extensive evidence to show that exposure to explicit sexual material either was or was not psychologically harmful to children. See 390 U.S. at 642–43 & n. 10, 88 S.Ct. 1274. Professor Ross, who has been critical of courts' efforts dealing with both types of restrictions, has observed: "In contrast to the dearth of support for the notion that sexually explicit speech is harmful, substantial social science research conducted over several decades lends support to the allegation that violent speech may lead some children to violent attitudes or actions." Catherine J. Ross, *Anything Goes: Examining the State's Interest in Protecting Children from Controversial Speech,* 53 Vand. L.Rev. 427, 505 (2000). In her next sentence, Professor Ross points out that the research on violent speech is "not uncontroverted." *Id.* Nevertheless, given *Ginsberg's* holding that legislatures are entitled to act reasonably to protect children in the face of inconclusive social science evidence about the danger of harm, the accumulation of research on the effects of violence in the media in recent decades provides ample basis for allowing states to take action similar to that taken with respect to sexual materials. See Joint Statement attached as Exhibit B.

Plaintiffs argue that sex is different from violence because violence has always been a prominent element of our culture, as reflected in our literature and art. Plaintiffs refer to the violence in *The Iliad,* for example, and they remind the court of some extraordinarily graphic violence depicted in paintings by the masters. Consider paintings of Salome being presented the head of John the Baptist on a platter, or paintings of the martyrdom of Saint Stephen or Saint Sebastian. The same could also be said, however, of sex. Consider Aristophanes' comic play *Lysistrata,* for example, or Shakespeare's *Othello,* or classical statues and paintings depicting the rape of the Sabines. For that matter, even *Romeo and Juliet* has plenty of both sex and violence, and it is taught in required high school English classes.

Plaintiffs also suggest that our culture's taboos with respect to sexual material are simply more universal and more firmly established than those with respect to violence. As a question of history, that is far from clear. Professor Saunders has traced the history of government efforts to regulate obscenity. He has shown that the concept was very broad in the 18th and early 19th centuries, including profanity and blasphemy, as well as descriptions or depictions of violence and sex. See Kevin W. Saunders, *Media Violence and the Ob-*

*scenity Exception to the First Amendment,* 3 Wm. & Mary Bill of Rts. J. 107, 116–27 (1994), discussing sources cited in *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), to support the conclusion that obscenity, however defined, should not be protected by the First Amendment. Professor Saunders also found examples in which both sexual and violent materials were treated as obscene in the 19th and early 20th centuries. He notes in his later book, for example, that in 1884, New York enacted a statute that regulated as "obscene" materials with "pictures and stories of deeds of bloodshed, lust or crime," and that other states passed similar statutes. Kevin W. Saunders, Violence as Obscenity: Limiting the Media's First Amendment Protection 113–18 (1996). An Indiana statute enacted in 1895 applied to both sex and violence. It banned the distribution of "any paper, book, or periodical, the chief feature or characteristic of which is the record of commission of crime, or to display by cut or illustration of crimes committed, or the acts or pictures of criminals, desperadoes, or of men or women in lewd and unbecoming positions or improper dress." 1895 Ind. Acts 230.

From the perspective of the year 2000, of course, it is easy to smile knowingly at the vague and broad prohibitions of those earlier laws treating depictions of both violence and sex as obscenity. However, if history and tradition should, as plaintiffs contend, guide the courts in limiting the concept of obscenity, those older statutes' vagueness and breadth by modern standards provide no basis for concluding they are irrelevant today in determining whether to draw a constitutional line, with respect to children, between sex and violence. The restrictions on sexual material in most of those older statutes and ordinances also would not survive modern First Amendment analysis, but the history of such restrictions obviously helped persuade the Supreme Court to preserve the First Amendment exception for a narrow category of sexually explicit material.

The restrictions on sexual material have been the principal focus of obscenity litigation for the past half-century. However, the Supreme Court has never squarely held that all attempts to restrict depictions of violence—especially when children are the audience—must violate the First Amendment. As discussed above, the Court's decisions offer no persuasive basis for expecting that a carefully drafted law restricting children's access to graphic violence in video games could never survive a First Amendment challenge.

### 3. Limits on the Extension of Obscenity to Violence

The plaintiffs' strongest argument against extending the reasoning of *Ginsberg* to graphic violence is the difficulty in drawing lines. Plaintiffs suggest that if research results on "harm to children" that are less than definitive are enough to justify censorship, the same logic will quickly be extended to such obviously protected but arguably harmful matters as anti-religious expression, "witchcraft," or depictions of inequality among racial groups or social classes. See Pl. Reply Br. at 9. With these possibilities in mind, plaintiffs defend drawing a line at sexual obscenity precisely, and simply, because the rationale that supports extending *Ginsberg* to reach graphic violence would otherwise be too difficult to limit. In addition, allowing government to regulate violent video games suggests that government could choose to regulate graphic violence in other media—books, television, and movies are obvious examples.

Plaintiffs' concerns about a slippery slope are important, but they fail to take into account other anchors that should prevent a slide into obviously unconstitutional censorship in the name of protecting children from asserted harms. Any law that attempts to regulate material as "harmful to minors" under *Ginsberg* must meet several requirements that serve to limit the scope of permissible government regulation. First, as shown above, the govern-

ment may not substantially limit adult access to the regulated material. Second, in acting to protect the well-being of children, the government must provide the safe harbors under the adapted *Miller* standard for those materials that have serious literary, artistic, political, or scientific value as a whole, that are not patently offensive, and that are not directed to children's morbid interest in violence. Third, the government cannot discriminate based on the viewpoint of the proscribed material. The Indianapolis Ordinance was drafted with careful attention paid to these major limiting principles.

The limiting principles that were built into the Ordinance to make it constitutional would make it difficult to impose sweeping restrictions on children's access to violence in media other than video games. *Playboy Entertainment Group, Reno v. ACLU,* and *Sable Communications,* for example, illustrate that some media are extremely difficult to regulate even when the state asserts an interest in protecting children—primarily because it would be difficult to restrict access for children without affecting the protected rights of adults. The third prong of the *Miller* standard—the societal value prong—also stands in the way of regulating violence in other media. For example, under a law attempting to limit children's access to graphic violence in books, television, and movies, the government would have to show that the particular book, television program, or movie "lacked serious literary, artistic, political or scientific value as a whole for persons under the age of eighteen (18) years." That would be a difficult burden to meet as applied to those media. In fact, the Ordinance may be constitutional as applied to some extremely violent video games precisely because the expressive elements of those video games are so inconsequential—especially as compared to significant elements of protected expression present in books, television, and movies.

The difficulty of providing a specific definition of the prohibited material and the difficulty of meeting the "patently offen-sive" prong of *Miller* also limit the reach of the variable obscenity doctrine as applied to violence. The City has crafted a reasonably objective definition of graphic violence by listing specific serious injuries (decapitation, dismemberment, maiming, etc.). The limits of the variable obscenity doctrine restrict the scope of permissible regulation to material that is both defined in a sufficiently objective way and patently offensive. In other words, not every depiction of an assault is patently offensive with respect to children. The range of activity covered by the term "assault" indicates that the term may not be specific enough to equate with the specific sexual activity identified in *Miller.* Attempts to regulate in content areas other than graphic violence or sex are likely to encounter similar difficulties in adequately defining the proscribed material.

Another important parallel between the statute upheld in *Ginsberg* and the Ordinance also limits the danger of falling down the slippery slope toward unconstitutional censorship: The Ordinance is not a viewpoint-based restriction. The definition of "graphic violence" applies without regard for any viewpoint that might be expressed. The safe harbors created by the other *Miller* factors—patently offensive, appealing to morbid interest, and no redeeming value—pose no greater threat of viewpoint discrimination with respect to violence than they do with sexual content. Thus, even if the violence in a video game is completely justified and shows the forces of good prevailing over the forces of evil in a fantastic battle, it is still regulated.

Any attempt to regulate children's access to material based on the viewpoint of proscribed material would raise serious constitutional questions and move the regulation outside the bounds of the variable obscenity doctrine. Even obscenity and "fighting words," which are usually described as simply outside all First Amendment protection, cannot be subjected to viewpoint-based discrimination. See

*R.A.V. v. St. Paul*, 505 U.S. at 383–84, 391, 112 S.Ct. 2538 (striking down city's attempt to regulate "hate speech" because "the First Amendment does not permit St. Paul to impose special prohibitions on those speakers who express views on disfavored subjects.").

Plaintiffs' expressed fears about the danger that any restriction on children's access to violent video games would inevitably lead to sweeping restrictions on other media are not persuasive in light of experience with restrictions on children's access to sexual content. Such restrictions have scarcely "cleansed" literature, films, and television, for example, of sexual themes and content.

The slippery slope argued by plaintiffs obviously deserves close attention. However, the doctrine of variable obscenity as to children and the careful drafting of the Indianapolis Ordinance provide several anchors to prevent a slide down that slope. The doctrine is self-limiting not because it is restricted to sexual material, but because it still holds laws to strict requirements before they can survive First Amendment challenge. New York's statute met the demanding requirements outlined in *Ginsberg*. Indianapolis' attempt to regulate children's access to video games containing graphic violence meets the requirements in this case, as adapted by *Miller* and as adapted for graphic violence.

### F. The Ordinance's Use of One Age Standard

Plaintiffs also contend the Ordinance violates the First Amendment because it fails to accommodate the different maturity levels of older and younger children.

Common sense shows there are differences between seven year olds and seventeen year olds when it comes to material with strong sexual content or graphic violence. As plaintiffs maintain, the violent material appropriate for young children and the violent material appropriate for older teenagers may be significantly different. Thus, in applying the third-prong of the adapted *Miller* standard, which is whether there is any serious literary, artistic, political, or scientific value for children, for example, it may be important to know whether the "reasonable minor" is an older child, a younger child, or some hypothetical "average child." The limited record before the court at this time does not contain much evidence either supporting or contradicting the claim that older minors are harmed less (or more) than younger children by exposure to graphic violence in video games as defined by the Ordinance.[13]

While plaintiffs maintain that any "solution" to the problem of different maturity levels would be inadequate, some cases address the issue of treating children as a group under a modified *Miller* standard. In the context of sexual material, some courts have concluded that " 'if a work is found to have serious literary, artistic, political or scientific value for a legitimate minority of normal, older adolescents, then it cannot be said to lack such value for the entire class of juveniles taken as a whole.' " *American Booksellers v. Webb*, 919 F.2d 1493, 1505 (11th Cir.1990), quoting *American Booksellers Ass'n v. Com. of Virginia*, 882 F.2d 125, 127 (4th Cir. 1989).[14]

---

**13.** One option available to the City would have been to regulate access to violent video games according to one or more additional age categories. Plaintiffs also contend that distinguishing among age groups would be unduly burdensome and call for even more arbitrary line-drawing. The original draft of the Ordinance took that approach, but it was amended in committee to use only one age standard after objections were raised by the video game industry.

**14.** In the context of adult obscenity, the Supreme Court has noted that "the mere fact that only a minority of a population may believe a work has serious value does not mean the 'reasonable person' standard would not be met." *Pope v. Illinois*, 481 U.S. 497, 501 n. 3, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987).

From the City's perspective, the Eleventh and Fourth Circuits' approach is problematic. It leaves younger children with less than an appropriate level of protection and may severely frustrate the purpose of the Ordinance. The court agrees. No matter where an age line is drawn, it would be possible to point to a "legitimate minority" of children just under the age limit for whom the prospect of harm would not be significant. If any age limit can be defeated by showing such a "legitimate minority" of children just a little bit younger, then no age limit could survive constitutional scrutiny.

A second approach to the problem appears in *Ginsberg* itself. In addressing the New York statute, the Supreme Court gave no indication that treating all children identically is unconstitutional when a state regulates material under a variable obscenity theory. All adults are treated as an undifferentiated group under the *Miller* standard, just as all children under 17 were treated as one group in *Ginsberg*. The City has chosen that approach in this case, and it survives scrutiny under *Ginsberg*. This court also sees no constitutional difference between drawing the line on an 18th birthday instead of a 17th birthday.

### G. *Plaintiffs' Challenges to the Operational Aspects of the Ordinance*

Plaintiffs also request relief from the provisions of the Ordinance that impose different requirements on large and small locations, require physical separation of harmful video games from other video games, and impose monitoring requirements on owners and operators to ensure that no unaccompanied minor can view or operate the regulated video games. See §§ 831–1, 831–5, 831–6. Plaintiffs contend that these "operational" provisions of the Ordinance are internally inconsistent and unnecessarily burdensome. As a result of these alleged drafting failures, the Ordinance is said to present a "trap" that is insufficiently tailored to serve the City's asserted interests in protecting children and empowering parents. Plaintiffs have

not shown that these operational aspects of the Ordinance are likely to make it unconstitutional.

First, the Ordinance directly furthers the City's compelling interests by limiting, but not banning, children's access to the regulated material. Alternative approaches to regulation that would be equally effective in preventing children from viewing and operating harmful games would not materially broaden anyone's access to protected speech. Compare *United States v. Playboy Entertainment Group*, —— U.S. at ——, 120 S.Ct. at 1887 (finding statute that significantly burdened adults' access to protected speech failed to use a plausible, less restrictive alternative and that "Government cannot ban speech if targeted blocking is a feasible and effective means of furthering its compelling interests.").

Second, the court disagrees with the plaintiffs' characterization of several of the provisions as overly burdensome, as explained below. Third, many of the detailed "operational aspects" of the Ordinance are difficult to evaluate in a facial challenge to the Ordinance. Fourth, the court disagrees with plaintiffs' assertion that the Ordinance stigmatizes adult use of violent video games to the point where the regulations unconstitutionally burden adults' right of access to these games. See *American Booksellers v. Webb*, 919 F.2d at 1501–02 (upholding regulations on display of material that is harmful to minors and finding the indirect burden on adults' First Amendment right to access the material was insignificant). For all of these reasons, the court will not enjoin the challenged operational provisions of the Ordinance. See §§ 831–1, 831–5, 831–6.

More specifically, plaintiffs contend that the Ordinance irrationally requires larger establishments both to create a physically partitioned area and to maintain ten feet of separation between all video games that are harmful to minors and those that are not harmful. Plaintiffs reason that if a physical wall divides the harmful games

from the other games, the additional ten-foot barrier serves no purpose—that it is essentially just a punishment for having any violent games at the establishment. If all establishments comply by building partitions with solid walls, that argument might have more force. However, the Ordinance also authorizes less expensive (and more permeable) barriers, which many establishments might choose as their means to comply. A ten-foot separation from the partitioned area would still serve a purpose by helping to prevent any temptation to "jump" the barrier.

In addition, the spacing requirements are open to a different interpretation. For example, where an amusement location creates a partitioned area for harmful games, the ten-foot spacing requirement can reasonably be read to apply to require measurement through the entrance to the partitioned area. Under this reading, harmful games and non-harmful games could co-exist on opposite sides of the same solid wall. Plaintiffs' argument on this point does not support a facial challenge.

With respect to the monitoring requirements imposed by the Ordinance, plaintiffs argue that the rules regarding "incidental views" and parental supervision/permission will be unworkable in practice. Plaintiffs envision owners, operators, and enforcement officials running around with stop watches and tape measures to ensure that parents remain within five feet of their children and that no minor ever has more than a thirty second exposure to the regulated games. These scenarios are both far-fetched and almost completely avoidable. See *American Booksellers v. Webb*, 919 F.2d at 1507 ("Since this is a facial challenge, we cannot, as appellees seem to suggest, consider the constitutional propriety of the most onerous methods of compliance which a broad reading of [the statute] could possibly require.").

Plaintiffs complain the Ordinance will burden them because they will be required to have an employee physically on the site to monitor the ages of players on games

deemed "harmful to minors." The coin-operated games now are typically left unattended. The requirement that games deemed "harmful to minors" be attended is no more burdensome than laws that effectively prohibit sale of sexually explicit magazines or alcoholic beverages in unattended vending machines. See, *e.g.*, *American Booksellers v. Webb*, 919 F.2d at 1506–08 (upholding ordinance barring public display of materials deemed obscene as to children); *Crawford v. Lungren*, 96 F.3d 380, 387–88 (9th Cir.1996) (upholding law barring sale of adult-oriented publications in unattended vending machines). This requirement does not render the Ordinance unconstitutional.

The "incidental view" provision that applies to "exhibitors" is obviously a reasonable accommodation for those smaller establishments that are not required to erect a physical partition between games "harmful to minors" and other games. See § 831–6(h). If the owner of a small establishment finds it too difficult to prevent minors from viewing the screens of regulated games, the owner certainly could choose to create a partitioned area and then not allow minors in that area. In addition, state courts may reasonably decide that the Ordinance's knowledge requirement applies to the incidental view provision. Under such an interpretation, the thirty second limit would serve as notice that once an owner knows that a child is viewing a regulated game, the owner needs to do something about it immediately.

Similarly, if owners find it too difficult to monitor parents' supervision of their children, they can follow the Ordinance's alternative procedure and require all parents to give express permission as provided in the Ordinance. See § 831–1 (defining "accompanied by"). Once a parent has given express permission, the parent would be free to roam about the establishment or even to leave the child on his own. The fact that a parent's permission "expires" at the end of each day raises no

serious constitutional issue. A longer term parental permission would not address the City's concern that the type of video games a particular establishment has on its premises may change over time without parents' knowledge.

Plaintiffs also challenge the provision of the Ordinance that completely bans amusement machines deemed harmful to minors on "public property." § 831–7. The City has responded that where it acts in a proprietary capacity rather than in its regulatory capacity, the First Amendment gives it considerably more (but not unlimited) latitude to choose who may use that property. See generally *International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). In any event, the City has presented evidence that "there are not now nor have there recently been" any games regulated by the Ordinance on public property. Ex. P–66 (Harris Aff. ¶ 2). Thus, no games are threatened with immediate removal under Section 831–7 and plaintiffs have not come forward with any evidence showing that anyone has applied, or will apply, to place any of the restricted games on public property. Because no one claims to be threatened with irreparable injury by the enforcement of Section 831–7, the court declines to consider the issue at this preliminary injunction stage.

## V. *Vagueness*

■■■■■■ Plaintiffs also contend that the Ordinance is unconstitutionally vague. The void-for-vagueness doctrine addresses the due process concern that "legislative enactments must articulate terms 'with a reasonable degree of clarity' to reduce the risk of arbitrary enforcement and allow individuals to conform their behavior to the requirements of the law." *Gresham v. Peterson*, 225 F.3d 899, 907–08 (7th Cir. 2000), quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 629, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), and *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). However, "a state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975). If a reasonable interpretation by a state court could cure the constitutional problem, a federal court should not hold a potentially vague statute unconstitutional. *Gresham v. Peterson*, 225 F.3d at 908–09.

■■■■ The degree of drafting precision demanded by the Constitution depends on the nature of the law. *Gresham v. Peterson* dealt with another Indianapolis ordinance enforceable by civil fines that was challenged on First Amendment grounds. The Seventh Circuit noted that "laws imposing civil rather than criminal penalties do not demand the same high level of clarity," but also found that this lowered burden is "mitigated" by the fact that a more stringent vagueness test applies to enactments that potentially interfere with free speech. *Id.* at 908. Plaintiffs argue that a heightened First Amendment vagueness threshold applies, and the City asserts that it has greater leeway in defining civil violations. Suffice it to say that "[i]t is . . . essential that legislation aimed at protecting children from allegedly harmful expression—no less than legislation enacted with respect to adults—be clearly drawn and that the standards adopted be reasonably precise." *Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 689, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968), quoting *People v. Kahan*, 15 N.Y.2d 311, 258 N.Y.S.2d 391, 206 N.E.2d 333, 335 (1965) (Fuld, J., concurring). The Ordinance meets that standard.

### A. *The Modified Miller Standard*

Complementing their argument that the *Miller* standard is restricted exclusively to regulation of sexual material, plaintiffs argue that the *Miller* standard is unconstitutionally vague as applied to graphic violence. Plaintiffs claim that the owners and operators of amusement locations are left with no guidance on the meaning of "morbid interest in violence," "patently of-

fensive," and "suitable material" as they attempt to segregate games that are "harmful to minors." Plaintiffs support that argument with the deposition of Deputy Mayor David Harris, who was asked to explain or define the terms "morbid interest in violence" and what is "suitable material" for children. Harris declined to offer a definition or explanation without consulting with the City's lawyers. Based on that testimony, plaintiffs argue that if the City's enforcement officials cannot understand those terms without consulting lawyers, they do not provide fair notice to plaintiffs and other video game operators as to what is regulated.

As explained above, the City's adaptation of the *Miller* standard is appropriate under the First Amendment. The Court is not persuaded by plaintiffs' secondary attack on vagueness grounds. Even if it is true, for example, that a given community can more readily agree on which sexual material is inappropriate for children than on which graphically violent material is inappropriate (though plaintiffs offer no evidence to support this assertion), that would not make the *Miller* standard unworkable *per se*. It would simply narrow the scope of permissible regulation to that particular subset of violent material where there is an acceptable level of agreement.

Plaintiffs' argument based on the Harris testimony is based on a misunderstanding of how the *Miller* standard works in practice. First, the law must identify with reasonable specificity the particular types of depictions that are prohibited, which the Indianapolis Ordinance does in its definition of "graphic violence." The other prongs of the modified *Miller* standard then work together to provide three analytically distinct "safe harbors" for material that contains "graphic violence." Those harbors are safe for material that either

does not predominantly appeal to minors' morbid interest in violence, or that is not "patently offensive" to prevailing standards in the community, or that nevertheless has serious literary, artistic, political, or scientific value as a whole for persons under 18 years old.

The Supreme Court has explained with respect to obscenity for adults that the three *Miller* prongs work together to "limit the uncertain sweep of the obscenity definition." See *Reno v. ACLU*, 521 U.S. at 873, 117 S.Ct. 2329. Similarly here, the entire standard works as an integrated "safety valve" to save from regulation some of those video games that contain graphic violence and strong sexual content. Thus, even if the court credited plaintiffs' argument that "morbid interest in violence" is in some way less precise than "prurient interest in sex," the standard as a whole retains the required precision. We have achieved a rough peace with the *Miller* standard as applied to sexual obscenity for adults, and it appears also to be constitutionally serviceable as adapted to regulate graphic violence in video games played by children.

For example, the three modified *Miller* prongs would presumably protect games like Gauntlet Legacy even if the game contains some graphic violence. The City apparently agrees: "By definition, the Ordinance steers clear of any video game that in fact contains the type of extensive plot, character development and narrative that plaintiffs attempt to ascribe to some games." Def. Br. at 11; see also *id.* at 4 ("The Ordinance does not apply to every game that displays 'graphic violence' or 'strong sexual content.' "). The Ordinance is consistent with this interpretation.[15]

The plaintiffs also argue more specifically that the Ordinance's "patently offensive"

15. For example, a video hockey game might include a fight during which a player's face is cut and his nose is broken. If the scene could be construed to show "bloodshed" or "disfiguration" realistically, it would appear to meet the Ordinance's definition of graphic violence. However, the modified *Miller* standard should save the game from regulation because the graphic violence in the game is not likely to be "patently offensive," and/or a video hockey game probably "predominantly appeals" to children's interest in hockey, not their "morbid interest in violence."

prong is particularly suspect under a vagueness analysis. Under the *Miller* standard (or a modified version), the objectionable material must be specifically defined, and the test for whether the material is "patently offensive" refers specifically to the objectionable portion of the work in question. The issue is not whether the work as a whole is patently offensive. See *American Booksellers v. Webb*, 919 F.2d at 1503 n. 18. Plaintiffs here argue that, because the Ordinance identifies "graphic violence" as the proscribed material in a clause separate from the clause that sets forth the "patently offensive" prong of the *Miller* standard, the Ordinance is unconstitutional as written because it fails to require "that graphic violence be depicted in a patently offensive way." Pl. Reply Br. at 19.

On its face the Ordinance is susceptible to plaintiffs' proposed interpretation, which would render it unconstitutional. However, the court is also confident that the Supreme Court of Indiana could and would easily construe the Ordinance to include the requirement that the graphic violence itself be "patently offensive." "We have regularly said that courts have an 'overriding obligation to construe our statutes in such a way as to render them constitutional if reasonably possible....'" *Brownsburg Area Patrons Affecting Change v. Baldwin*, 714 N.E.2d 135, 141 (Ind.1999), quoting *A Woman's Choice–East Side Women's Clinic v. Newman*, 671 N.E.2d 104, 111 (1996) (Dickson, J., concurring); *Burris v. State*, 642 N.E.2d 961, 968 (Ind.1994) ("[A] statute is accorded every reasonable presumption supporting its validity."), citing *Brady v. State*, 575 N.E.2d 981 (Ind.1991); see also Ind.Code § 35–49–2–2 (identifying the proscribed material in a separate clause).

### B. *The Definition of "Graphic Violence"*

Plaintiffs also claim that the Ordinance's definition of graphic violence is unconstitutionally vague. As already noted, the Ordinance's formulation of graphic violence is reasonably objective and is not far afield from the proscribed conduct and various states of nudity that are used to define sexual obscenity as to minors.[16] The drafters of the Ordinance chose to define the proscribed content according to the *specific* types of injury inflicted on the characters and depicted in the game. If one of the listed injuries is depicted or represented, it will qualify as graphic violence. Perhaps one can quibble at the margins about the exact meaning of "mutilation" or "disfiguration," but the terms are "reasonably precise." See *Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. at 689, 88 S.Ct. 1298, 20 L.Ed.2d 225. In addition, it was reasonable to focus on the injuries that are depicted rather than the conduct that causes the injuries. Cf. *Miller v. California*, 413 U.S. 15, 25, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (suggesting that definitions of adult obscenity could include representations or descriptions of "ultimate sexual acts, normal or perverted, actual or simulated" and of "masturbation, excretory functions, and [lewd] exhibition of the genitals").

Moreover, even if the definition of graphic violence could be interpreted in a broad, open-ended manner, a state court could provide a reasonable narrowing construction that would render the Ordinance constitutional in some applications. See *Gresham v. Peterson*, 225 F.3d at 908–09. For example, to the extent that the word "including" implies that the definition of graphic violence offers an incomplete list of the proscribed "serious injuries," a state court could easily determine that the list is exclusive. See *id.* at 908. Similarly, this

---

**16.** The key terms upheld in *Ginsberg*, although a product of their time, certainly were not inherently more precise than the specific types of injury listed in the Ordinance. See *Ginsberg v. New York*, 390 U.S. 629, 645–46, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (reproducing statute's definitions of nudity, sexual conduct, sexual excitement, and sado-masochistic abuse).

court need not decide whether a human-like alien's green ooze counts as "bloodshed." [17] These decisions can and should be made by the Indiana courts. Because the City has met its obligation to define with reasonable specificity the violent material it seeks to regulate, plaintiffs are unlikely to succeed on their claim that the definition is unconstitutionally vague.

*Conclusion*

It would be an odd conception of the First Amendment and "variable obscenity" that would allow a state to prevent a boy from purchasing a magazine containing pictures of topless women in provocative poses, as in *Ginsberg,* but give that same boy a constitutional right to train to become a sniper at the local arcade without his parent's permission. The plaintiffs have not shown they are reasonably likely to succeed on their claims that the Indianapolis Ordinance violates the First Amendment or is unconstitutionally vague. Accordingly, the plaintiffs' motion for a preliminary injunction is denied.

So ordered.

EXHIBIT A

CITY–COUNTY GENERAL ORDINANCE NO. 72, 2000

Proposal No. 239, 2000

PROPOSAL FOR A GENERAL ORDINANCE to regulate the conduct of persons who own or operate places of business which contain amusement machines and/or video games, in such a manner that restricts and prohibits access to amusement machines and/or video games which are deemed harmful to minors, and to prohibit such amusement machines and/or video games on public property.

WHEREAS, Marion County and the City of Indianapolis have compelling interests in protecting the well-being of minors, in protecting parents' authority to shield their minor children from influences that the parents find inappropriate or offensive, and in reducing juvenile crime; and

WHEREAS, our courts have recognized that minors are affected by and may be protected from patently offensive sex-related material; and

WHEREAS, recent academic literature corroborates the finding of earlier studies that violent video games produce psychological effects in minor children and that prolonged exposure to violent video games increases the likelihood of aggression·in minor children (see Craig A. Anderson & Karen E. Dill, Video Games and Aggressive Thoughts, Feelings, and Behavior in the Laboratory and in Life, 78 J. of Personality and Soc. Psychol. 772 (2000) (summarizing past research and noting that the "positive association between violent video games and aggressive personality is consistent with a developmental model in which extensive exposure to violent video games . . . contributes to the creation of an aggressive personality" and concluding that "the present data indicate that concern about the potentially deleterious consequences of playing violent video games is not misplaced")); and

WHEREAS, growing evidence of the harmful effects of violent video games has led Congress to investigate the impact of these games on minor children (see Hearing on "The Impact of Interactive Violence on Children," United States Senate Comm. on Commerce, Science & Transportation, 106th Cong. (March 21, 2000) ("Hearing"); see also Majority Staff of Senate Comm. on the Judiciary, 106th Cong., Children, Violence and the Media: A Report for Parents and Policy Makers (Sept. 14, 1999)), and has led President Clinton to ask the Federal Trade Commission to investigate the marketing of violent video games to minor children (see Letter from William J. Clinton, President, to Janet Reno, Attorney General of the United States, and Robert Pitofsky, Chairman,

---

17. At least some video games have switches that allow the player or the exhibitor to choose from among several colors of "blood."

Federal Trade Commission (June 1, 1999)); and

WHEREAS, producers and retailers of video games agree that "the best control is parental control" (see Statement of the Video Software Dealers Association in conjunction with Hearing, above); and .

WHEREAS, testimony before Congress indicates that fourth through eighth graders report spending an average of from half an hour to two-and-a-half hours playing video games in arcades each week (see Hearing, above, Testimony of Jeanne B. Funk, Ph.D., clinical child psychologist); and

WHEREAS, parents are less able in public places than in the home to control the level of violence and sexual content to which their minor children are exposed; now, therefore, :

BE IT ORDAINED BY THE CITY-COUNTY COUNCIL OF THE CITY OF INDIANAPOLIS AND OF MARION COUNTY, INDIANA:

SECTION 1. Section 831–1 of the "Revised Code of the Consolidated City and County," regarding definitions, hereby is amended by the deletion of the language which is stricken-through, and by the addition of the language which is underscored, to read as follows:

## Sec. 831–1. Definitions.

As used in this chapter, the following terms shall have the meanings ascribed to them in this section. .

*Accompanied by for purposes of subsections 831–5(h), 831–5(i), 831–5(j), 831–6(f), 831–6(g), and 831–6(h), means that the parent, guardian, or custodian of the minor either:*

*(1) Is within five feet of the minor at all times while the minor is operating the amusement machine; or,*

*(2) Has appeared in person with the minor at the amusement location or place of business containing amusement machines on that day and has given his or her permission for the exhibitor or registrant or an employee of the exhibitor or registrant to place on the back of the minor's hand or wrist a clearly visible, non-transferable designation such as a stamp or wrist band signifying that the parent, guardian, or custodian has consented to allow the minor to operate amusement machines that are harmful to minors.*

*Amusement location means any public room or area in the city which contains five (5) or more amusement machines; however, amusement locations shall not include premises which are licensed (as defined in IC 7.1–1–3–20) for the sale of alcoholic beverages and where entry is limited to persons who are eighteen (18) years of age or older.*

*Amusement machine means a currency-operated machine or device, including a machine or device operated by tokens, cards, points, or other currency-like means, offered to the public as a game or amusement, the object of which is to achieve a high or low score based on the skill of the player, including, but not limited to, video games, pool or billiard tables and pinball machines. Such a machine or device designed and used exclusively for the vending of merchandise of a tangible nature shall not be deemed an amusement machine.* .

*Exhibitor means a person who owns or operates a place of business in the city where four (4) or fewer amusement machines are located; however, the provisions of this chapter shall not apply to an exhibitor's place of business which is licensed (as defined in IC 7.1–1–3–20) for the sale of alcoholic beverages and where entry is limited to persons who are eighteen (18) years of age or older.*

*Graphic violence means an amusement machine's visual depiction or representation of realistic serious injury to a human or human-like being where such serious injury includes amputation, decapitation, dismemberment, bloodshed, mutilation, maiming or disfiguration.*

*Harmful to minors* means an amusement machine that predominantly appeals to minors' morbid interest in violence or minors' prurient interest in sex, is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for persons under the age of eighteen (18) years, lacks serious literary, artistic, political or scientific value as a whole for persons under the age of eighteen (18) years, and:

(1) Contains graphic violence; or,

(2) Contains strong sexual content.

*Incidental view* means a minor's view for fewer than thirty (30) seconds of the playing surface or screen of an amusement machine.

*Knowingly* means having general knowledge of, or reason to know, or a belief or ground for belief that warrants further inspection or inquiry of both:

(1) The character and content of the visual representations of the amusement machine; and,

(2) The age of the person operating or seeking to operate the amusement machine, provided, however, that an honest mistake shall constitute an excuse from liability hereunder if the defendant made a reasonable bona fide attempt (including but not limited to asking for legal photo identification) to ascertain the true age of the minor.

*Minor* means a person under the age of eighteen (18) years. This definition does not apply to a minor who has obtained a court decree pursuant to IC 31-34-20-6.

*Not harmful* means an amusement machine that is not harmful to minors.

*Nudity* means an amusement machine's visual depiction or representation of human male or female genitals, pubic area or buttocks with less than a fully opaque covering, or of a female breast with less than a fully opaque covering of any part of the nipple, or the showing of covered male genitals in a discernibly turgid state.

*Parent, guardian or custodian* means and includes a person who has legal custody of the ~~child~~ minor and is the ~~child's~~ minor's:

(1) Natural parent;

(2) Stepparent, adoptive parent or custodian as those terms are defined by IC 35-42-4-7;

(3) Guardian as defined by IC 29-3-1-6; or

(4) Other adult who has been appointed by a court to care for a ~~child~~ minor;

but, *for purposes of subsections 831-5(e), 831-5(f) and 831-5(g) and subsections 831-6(c), 831-6(d) and 831-6(e)*, shall not include an exhibitor, or owner or operator of an amusement location with respect to a ~~child~~ minor who is present in the exhibitor's, owner's or operator's place of business.

*Pool or billiard table* means a table used for any form of the games commonly referred to as pool or billiards and includes any table of any size, the top of which is surrounded by an elastic ledge or cushion and which is designed or used to play any game which consists of impelling balls by means of sticks or cues.

~~*Exhibitor* means a person who owns or operates a place of business in the city where four (4) or fewer amusement machines are located.~~

*Public property* means all buildings and areas within Marion County that are owned, operated, or leased as lessee, by the City of Indianapolis, Marion County, a city or county department, a city-county agency, or a township, including but not limited to the Department of Parks and Recreation, but does not include property for which the City of Indianapolis, Marion County is the lessor.

*Registrant* in this chapter means a person registered with the controller under this chapter as the owner or operator of an amusement location in the city.

*Strong sexual content* means the visual depiction or representation by an amuse-

*ment machine of nudity or explicit human sexual behavior by any human or human-like being in one or more of the following forms: masturbation; deviate sexual conduct; sexual intercourse; or, fondling of genitals.*

SECTION 2. · Section 831–5 of the "Revised Code of the Consolidated City and County," regarding · operation of amusement locations, hereby is amended by the deletion of the language which is stricken-through, and by the addition of the language which is underscored, to read as follows:

**Sec. 831–5.  Operation of amusement locations; violations.**

(a) All amusement locations shall· be kept in a clean, healthful and sanitary condition 'at all times and the controller shall have the power to determine if such room or rooms are kept in a clean, healthful and sanitary. condition and for such purpose, when desired, have the assistance of any law enforcement agency or the Health and Hospital Corporation of Marion County. If the controller shall determine, by a law enforcement agency or the division of buildings of the Health and Hospital Corporation of Marion County, that an unsanitary condition exists within an amusement location or on property immediately adjacent to the amusement location, which property is under the control of the amusement location owners or their lessee or lessor, the controller shall have the power to suspend the amusement location registration until such unsanitary condition is rectified.

(b) No registrant under this chapter shall permit persons to congregate in a disturbing manner within an amusement location or on parking areas or other property immediately adjacent to or normally used for purposes of parking for an amusement location which property is under the control of the amusement location owner or owners or their lessee or lessor.  A violation of this provision shall be sufficient grounds for the revocation of the amuse-

ment location registrations by the controller.

(c) No registrant under this chapter, or registrant's employee, shall violate any state statute or city ordinance, or allow any other person to commit such violation, within an amusement location or on parking areas or other property immediately adjacent to or normally used for purposes of parking for an amusement location which property is under the control of the amusement location owner or owners or their lessee or lessor.  A violation of this provision shall be sufficient grounds for the revocation of the amusement location registrations by the controller.

(d) All employees of a registrant under this chapter shall be eighteen (18) years of age or older.

(e) It shall be unlawful for a person to allow a ~~child~~ *minor* under sixteen (16) years of age who is subject to the compulsory school attendance laws of the state and who is not accompanied by the ~~child's~~ *minor's* parent, guardian or custodian to be present· in an amusement location between·the hours of 7:00 a.m. and 3:30 p.m. on a day when such ~~child's~~ *minor's* school is in session.

(f) It shall be unlawful for a person to allow a ~~child under eighteen (18) years of age~~ *minor* to be present in an amusement location after the hours established by state statute or city ordinance for juvenile curfew unless such ~~child~~ *minor* is accompanied by the ~~child's~~ *minor's* parent, guardian or custodian, or an adult specified by the ~~child's~~ *minor's* parent, guardian or custodian.

(g) It shall be unlawful for a person to operate an amusement location unless a sign is conspicuously posted inside the location which provides that no ~~child~~ *minor* under sixteen (16) years of age may be present in an amusement location between the hours of 7:00 a.m. and 3:30 p.m. on a day when the ~~child's~~ *minor's* school is in session unless accompanied by the ~~child's~~ *minor's* parent, guardian or custodian, and

that no ~~child under eighteen (18) years of age~~ *minor* may be present in an amusement location in violation of the curfew established by state statute or city ordinance.

*(h) It shall be unlawful for a registrant, a registrant's agent, or an employee of an amusement location knowingly to allow a minor who is not accompanied by the minor's parent, guardian or custodian to operate in the amusement location an amusement machine that is harmful to minors.*

*(i) It shall be unlawful for a registrant to operate an amusement location unless each amusement machine that is harmful to minors in the amusement location displays a conspicuous sign indicating that the machine may not be operated by a minor under eighteen (18) years of age unless the minor is accompanied by his or her parent, guardian, or custodian. If amusement machines that are harmful to minors are displayed together in an area separate from amusement machines that are not harmful, a single conspicuous sign in that area or at the entrance to that area may be used to mark the group of machines for purposes of this subsection.*

*(j) It shall be unlawful for a registrant to make available to patrons any amusement machine that is harmful to minors within ten (10) feet of an amusement machine that is not harmful. It shall further be unlawful for a registrant not to separate amusement machines that are harmful to minors from other machines by some form of partition, divider, drape, barrier, panel, screen, or wall that completely obstructs the view of persons outside the partitioned area of the playing surface or display screen of the machines that are harmful to minors. It shall be unlawful for a registrant, registrant's agent, or employee of an amusement location to allow a minor who is not accompanied by his or her parent, guardian, or custodian into the partitioned area.*

*(k) It shall be unlawful for a registrant to make available to patrons any amuse-* *ment machine that is harmful to minors if the registrant has been cited for three (3) or more violations of Section 831–5(h), (i), (j), or (k) of this Code in any twelve-month period in the preceding three (3) years.*

*(l) One or more violations of Section 831–5(h), (i), (j), or (k) of this Code may serve as grounds for suspension or revocation of the amusement location's registration, pursuant to the authority vested in the controller and procedures prescribed in Chapter 801 of this Code. Three (3) or more violations of Section 831–5(h), (i), (j), or (k) of this Code, however, shall require revocation of the amusement location's registration, subject to the notice and hearing requirements of Chapter 801. For the purposes of this subsection, no more than one violation shall be deemed to have occurred on any one day.*

SECTION 3. Section 831–6 of the "Revised Code of the Consolidated City and County," regarding operation of amusement machines by exhibitors, hereby is amended by the deletion of the language which is stricken-through, and by the addition of the language which is underscored, to read as follows:

**Sec. 831–6. Operation of amusement machines by exhibitors; violations.**

(a) No exhibitor or exhibitor's employee shall permit persons to congregate in a disturbing manner on the premises of the exhibitor's place of business.

(b) No exhibitor or exhibitor's employee shall violate any state statute or city ordinance, or allow any other person to commit such violation on the premises of the exhibitor's place of business.

(c) It shall be unlawful for an exhibitor or the exhibitor's employee to allow a ~~child~~ *minor* under sixteen (16) years of age who is subject to the compulsory school attendance laws of the state and who is not accompanied by the ~~child's~~ *minor's* parent, guardian or custodian to operate an amusement machine in the exhibitor's place of business between the hours of 7:00

a.m. and 3:30 p.m. on a day when such ~~child's~~ minor's school is in session.

(d) It shall be unlawful for an exhibitor or the exhibitor's employee to allow a ~~child under eighteen (18) years of age~~ minor to operate an amusement machine in the exhibitor's place of business after the hours established by state statute or city ordinance for juvenile curfew unless such ~~child~~ minor is accompanied by the ~~child's~~ minor's parent, guardian or custodian, or an adult specified by the ~~child's~~ minor's parent, guardian or custodian.

(e) It shall be unlawful for an exhibitor to have amusement machines in his or her place of business unless a sign is conspicuously posted near any amusement machines which provides that no ~~child~~ minor under sixteen (16) years of age may operate an amusement machine between the hours of 7:00 a.m. and 3:30 p.m. on a day when the ~~child's~~ minor's school is in session unless accompanied by the ~~child's~~ minor's parent, guardian or custodian, and that no ~~child under eighteen (18) years of age~~ minor who is in violation of the curfew established by state statute or city ordinance may operate an amusement machine.

(f) It shall be unlawful for an exhibitor, an exhibitor's agent, or an exhibitor's employee knowingly to allow a minor who is not accompanied by the minor's parent, guardian or custodian to operate in the exhibitor's place of business an amusement machine that is harmful to minors.

(g) It shall be unlawful for an exhibitor to make available to patrons in his or her place of business amusement machines that are harmful to minors unless each amusement machine that is harmful to minors displays a conspicuous sign indicating that the machine may not be operated by a minor under eighteen (18) years of age unless the minor is accompanied by his or her parent, guardian, or custodian. If amusement machines that are harmful to minors are displayed together in an area separate from amusement machines that are not harmful, a single conspicuous

sign in that area or at the entrance to that area may be used to mark the group of machines for purposes of this subsection.

(h) It shall be unlawful for an exhibitor to make available to patrons any amusement machine that is harmful to minors within ten feet of an amusement machine that is not harmful. It shall further be unlawful for an exhibitor, exhibitor's agent, or exhibitor's employee to allow a minor who is not accompanied by his or her parent, guardian, or custodian to view, with the exception of an incidental view, the playing surface or screen of a game that is harmful to minors.

(i) It shall be unlawful for an exhibitor to make available to patrons any amusement machine that is harmful to minors if the exhibitor has been cited for three (3) or more violations of Section 831–6(f), (g), (h), or (i) of the Code in any twelve-month period in the preceding three (3) years.

SECTION 4. Chapter 831 of the "Revised Code of the Consolidated City and County," regarding amusement machine locations, hereby is amended by the addition of a NEW Section 831–7, regarding harmful games on public property, to read as follows:

### Sec. 831–7. Harmful games on public property.

It shall be unlawful for an registrant or exhibitor to make available on public property any amusement machine that is harmful to minors.

SECTION 5. Section 831–7 of the "Revised Code of the Consolidated City and County," regarding inspections and reports of violations, upon the passage of this ordinance shall be RENUMBERED as "Section 831–8."

SECTION 6. Section 831–8 of the "Revised Code of the consolidated City and County," regarding enforcement and penalties, hereby is amended by the deletion of the language which is stricken-through, and by the addition of the language which is underscored, to read as follows:

### Sec. 831–89. Enforcement and penalties.

A person who violates any provision of this chapter shall be punishable as provided in section 103–3 of the Code; provided, however, the fine imposed for such violation shall not be less than two hundred dollars ($200.00), *that for the purpose of assessing fines no more than one violation shall be deemed to have occurred on any one day*, and *that* each day that an offense continues shall constitute a separate violation. The fines assessed for violations of this chapter shall be deposited with the law enforcement agency that caused the violation to be filed, if any.

SECTION 7. The expressed or implied repeal or amendment by this ordinance of any other ordinance or part of any other ordinance does not affect any rights or liabilities accrued, penalties incurred, or proceedings begun prior to the effective date of this ordinance. Those rights, liabilities, and proceedings are continued, and penalties shall be imposed and enforced under the repealed or amended ordinance as if this ordinance had not been adopted.

SECTION 8. Should any provision (section, paragraph, sentence, clause, or any other portion) of this ordinance be declared by a court of competent jurisdiction to be invalid for any reason, the remaining provision or provisions shall not be affected, if such remaining provisions can, without the invalid provision or provisions, be given the effect intended by the Council. To this end, the provisions of the ordinance are severable.

SECTION 9. This ordinance shall be in effect September 1, 2000.

The foregoing was passed by the City–County Council this 10th day of July, 2000, at 9:17 p.m.

ATTEST:

/s/ ⎯⎯⎯⎯⎯⎯

Dr. Beurt SerVaas

President, City–County Council.

/s/ ⎯⎯⎯⎯⎯⎯

Suellen Hart, Clerk, City–County Council

Presented by me to the Mayor this 13th day of July, 2000, at 10:00 a.m.

/s/ ⎯⎯⎯⎯⎯⎯

Suellen Hart, Clerk, City–County Council

Approved and signed by me this *17th* day of July, 2000

/s/ ⎯⎯⎯⎯⎯⎯

Bart Peterson, Mayor

STATE OF INDIANA; MARION COUNTY·

CITY OF INDIANAPOLIS

I, Suellen Hart, Clerk of the City–County Council, Indianapolis, Marion County, Indiana, do hereby certify the above and foregoing is a full, true, and complete copy of Proposed No. 239, 2000, a Proposal for GENERAL ORDINANCE, passed by the City–County Council on the 10th day of July, 2000, by a vote of 27 YEAS and 0 NAYS, and was retitled General Ordinance No. 72, 2000, which was signed by the Mayor on the 17th day of July, 2000, and now remains on file and on record in my office. WITNESS my hand and the official seal of the City of Indianapolis, Indiana, this 17th day of July, 2000.

/s/ ⎯⎯⎯⎯⎯⎯

Suellen Hart, Clerk, City–County Council

[SEAL]

### EXHIBIT B

Joint Statement on the Impact
of Entertainment Violence
on Children

Congressional Public Health Summit

July 26, 2000

We, the undersigned, represent the public health community. As with any community, there exists a diversity of viewpoints—but with many matters, there is also consensus. Although a wide variety of viewpoints on the import and impact of entertainment violence on children may exist outside the public health community,

within it, there is a strong consensus on many of the effects on children's health, well-being and development.

Television, movies, music, and interactive games are powerful learning tools, and highly influential media. The average American child spends as much as 28 hours a week watching television, and typically at least an hour a day playing video games or surfing the Internet. Several more hours each week are spent watching movies and videos, and listening to music. These media can, and often are, used to instruct, encourage, and even inspire. But when these entertainment media showcase violence—and particularly in a context which glamorizes or trivializes it—the lessons learned can be destructive.

There are some in the entertainment industry who maintain that 1) violent programming is harmless because no studies exist that prove a connection between violent entertainment and aggressive behavior in children, and 2) young people know that television, movies, and video games are simply fantasy. Unfortunately, they are wrong on both counts.

At this time, well over 1000 studies—including reports from the Surgeon General's office, the National Institute of Mental Health, and numerous studies conducted by leading figures within our medical and public health organizations—our own members—point overwhelmingly to a causal connection between media violence and aggressive behavior in some children. The conclusion of the public health community, based on over 30 years of research, is that viewing entertainment violence can lead to increases in aggressive attitudes, values and behavior, particularly in children.

Its effects are measurable and long-lasting. Moreover, prolonged viewing of media violence can lead to emotional desensitization toward violence in real life.

The effect of entertainment violence on children is complex and variable. Some children will be affected more than others. But while duration, intensity, and extent of the impact may vary, there are several measurable negative effects of children's exposure to violent entertainment. These effects take several forms.

— Children who see a lot of violence are more likely to view violence as an effective way of settling conflicts. Children exposed to violence are more likely to assume that acts of violence are acceptable behavior.

— Viewing violence can lead to emotional desensitization towards violence in real life. It can decrease the likelihood that one will take action on behalf of a victim when violence occurs.

— Entertainment violence feeds a perception that the world is a violent and mean place. Viewing violence increases fear of becoming a victim of violence, with a resultant increase in self-protective behaviors and a mistrust of others.

— Viewing violence may lead to real life violence. Children exposed to violent programming at a young age have a higher tendency for violent and aggressive behavior later in life than children who are not so exposed.

Although less research has been done on the impact of violent interactive entertainment (video games and other interactive media) on young people, preliminary studies indicate that the negative impact may be significantly more severe than that wrought by television, movies, or music. More study is needed in this area, and we urge that resources and attention be directed to this field.

We in no way mean to imply that entertainment violence is the sole, or even necessarily the most important factor contributing to youth aggression, anti-social attitudes, and violence. Family breakdown, peer influences, the availability of weapons, and numerous other factors may all contribute to these problems. Nor are we advocating restrictions on creative activity. The purpose of this document is descriptive, not prescriptive; we seek to lay out a clear picture of the pathological effects of entertainment violence. But we

do hope that by articulating and releasing the consensus of the public health community, we may encourage greater public and parental awareness of the harms of violent entertainment, and encourage a more honest dialogue about what can be done to enhance the health and well-being of America's children.

/s/ —————

Donald E. Cook, MD

President

American Academy of Pediatrics

/s/ —————

Clarice Kestenbaum, MD

President

American Academy of Child American Medical Association & Adolescent Psychiatry

/s/ —————

Bruce Bagly, MD

President

American Academy of Family Physicians

/s/ —————

L. Michael Honaker, Ph.D.

Deputy Chief Executive Officer

American Psychological Association

/s/ —————

Dr. E. Ratcliffe Anderson, Jr. MD

Executive Vice President

American Medical Association